BY THE

ST. LOUIS, KANSAS CITY AND SPRINGFIELD

# COURTS OF APPEALS

## AT THE

## MARCH TERM, 1916.

---

ORA M. HAINES, Admrx., Respondent, v. THE CHI-
CAGO, ROCK ISLAND & PACIFIC RAILWAY,
Appellant.

**Kansas City Court of Appeals, March 6, 1916.**

1. NEGLIGENCE: Railroads: Res Gestae. The plaintiff, a
widow of a deceased brakeman, sued to recover damages for
his death, caused by the negligence of the defendant. The
husband was a front brakeman on an extra freight train, which
train was pulled onto a siding to allow a passenger train to
have the right-a-way. When the passenger train had passed,
the engineer, after blowing the whistle twice, but before re-
ceiving any signal from the husband, as front brakeman, started
his train. Plaintiff's husband was found dead on the track,
having been run over, apparently where he had gone to fix
a leak in the air break hose. *Held*, that the weight of the
plaintiff's evidence, as well as the issues of the credibility of
plaintiff's witnesses were issues of fact which have been defi-
nitely and irrevocably settled by the verdict.

2. EVIDENCE: Res Gestae. When one makes a statement to
a fellow employee, when they are going on their respective
duties, that he is going to fix a leak in an air hose and he
is killed shortly afterwards, such a declaration is admissible
in evidence as part of *res gestae* relating to the constitutive
fact of whether he was in the discharge of duty or had di-
gressed and was where he should not have been.

3. ———: Motion to Strike Out. The only way improper matter
in an answer to a proper question may be reached is by a mo-
tion to strike out such answer, otherwise the objection will
be deemed to have been waived.

193 App.]            (453)

Appeal from Daviess Circuit Court.—*Hon. A. B. Davis,* Judge.

AFFIRMED.

*Platt Hubbell* and *George H. Hubbell* , for respondent.

*Paul E. Walker* and *A. G. Knight* for appellant.

JOHNSON, J.—Plaintiff, the widow of Harry B. Haines, deceased, brought this suit, as administratrix of his estate, to recover damages for his death which she alleges was caused by negligence of defendant. At the time of his death which occurred January 28, 1912, after midnight, Haines was the head brakeman on an extra freight train engaged in interstate commerce and the pleaded cause of action is based upon the Employers' Liability Act approved April 22, 1908, as amended by the Act of April 5, 1910. The train, composed of a locomotive, thirty or thirty-five freight cars and a caboose, had been held nearly four hours on the passing track at Tindall a station six miles north of Trenton, which is a division station for defendant's railroad, and Haines was killed by the starting of the train, being run over and cut in two by the rear wheels of the first car from the engine. The amended petition on which the case was tried alleges that it was the duty of the engineer not to move the train without a signal from the head brakeman, and that his negligent breach of such duty was the proximate cause of the death of the brakeman. The answer is a general denial and pleas of contributory negligence and assumed risk. A trial to a jury resulted in a verdict and judgment for plaintiff and defendant appealed.

The record is voluminous but the facts material to the present inquiry may be stated as follows: The tracks at Tindall run north and south and consist of a main track, a passing track and a house track the former being in the middle and on the west side of the station. The extra freight train was southbound and was run on to the passing track and stopped with the engine near the south end of that track. It was held there nearly four hours for other trains, both passenger and freight to pass. The locomotive was about ten car lengths south of the depot and during the long wait Haines, and perhaps others of the crew, spent most of his time in the depot where it was warm and where he enjoyed the companionship of some of the townsmen.

The evidence of plaintiff tends to show that Haines was under duty to watch a road crossing a short distance from the depot and to attend to having the crossing opened if a traveler appeared on the public road, and that he was at his proper post for the performance of such duty which it appears required no performance that night, as no belated traveler appeared to demand that the crossing be opened. On the other hand there is evidence that while in the depot Haines was duty free and participated in a carousal with the townsmen which was generated and accelerated by the frequent passing of a jug of whiskey one of the late arrivals brought with him.

A northbound freight train came in and was held at Tindall until after the passage of the northbound limited passenger train. The house track was full of cars, and the only available place for that train was on the north end of the passing track. Accordingly it pulled up on the main line, backed in on the passing track and stopped with its caboose a short space—perhaps a carlength—from the caboose of the southbound train. The passing track was not long

enough to receive the entire train and its north end extended into and fouled the main line. Under defendant's rule the limited, being a superior train, was entitled to a clear track and it was the imperative duty of the operators of these freight trains, since they had to foul the main track to warn the limited and exert all possible haste to clear the track. To do this they were compelled "to saw by" (to borrow a term from railroad slang)—which meant that they were to remain stationary until the limited cleared the south end of the passing track and then both freight trains were to move south, the front end of the extra freight passing on to the main line a sufficient distance to allow the northbound freight to back entirely on to the passing track and thereby clear the way for the limited. The main line was protected by the block system which, as we understand, would signal the coming of the limited when it was still several miles away. It was the duty of the rear brakeman of the northbound freight (the witness Calder) to go back some distance beyond the south switch to signal the engineer of "the limited" to stop and to inform him of the situation. Ten or fifteen minutes before the coming of the limited Calder and Haines walked from the depot south to the locomotive of the extra freight train and remained there until the block signal heralded the approach of the limited.

Calder testified "as we came up by the cars there was a leak in the air hose. I don't know where it was, but some place between the depot and the engine and he (Haines) said 'There is leak enough to blow your head off.'"

For some reason (not explained) Haines whose duty it was—so plaintiff claims—to repair such a leak if he could, did not stop but went on with Calder and visited with him in the cab of the engine ten minutes or more until warned of the coming of the lim-

ited. That signal was also the signal for the freight train crews to begin preparing for the movement to "saw by." Calder was to go down the track and stop the limited long enough for him to board the engine and ride back to the rear end of his own train. Haines was to go to the switch in time to throw it after the passage of the limited in order that his train could advance on to the main track. Calder testified that Haines had plenty of time to fix a leak in, the air hose before going to the switch and that when they left the cab in response to the block signal, Haines remarked that he was going back to fix the air hose.

Defendant objected to this testimony but the objection was overruled. No one saw Haines alive after that. As soon as the block signal showed a clear track after the passage of the limited, the engineer of the extra freight sounded two blasts of the whistle and started up. No one was at the switch and he stopped or slowed down and blew the whistle four times for a signal from Haines. Receiving none, his fireman took a switch key and went forward from the engine and turned the switch. Becoming alarmed over the absence of Haines from his post the crew made a search and found his body cut in two and the indications were that he was under the first freight car when the train started. Ten cars had passed over his body. The engineer admits that he started without a signal from Haines or any member of either crew, and claims that he was justified in doing so when the block signal showed a clear track and that the only duty he owed his crew and others was to do what he did—give a signal on his whistle that he was about to start. The printed rules of defendant did not deal with this precise subject and there is evidence *pro* and *con* on the issue of the custom and practice of train operators in such cases. Witnesses for plaintiff (chiefly discharged employees of defend-

ant) testified that the invariable custom was for the engineer in such situation not to start without a signal from the head brakeman or conductor, while the witnesses for defendant say there was no such custom and that the engineer's warning signal of two blasts on the whistle was the only signal required by custom or for the proper protection of the crew. If we were exercising the functions of triers of fact we would not hesitate in finding that the weight of the evidence on this issue is greatly on the side of defendant, but our duty to examine and weigh evidence stops when we find it presents a substantial controversy about which reasonable minds might reach different conclusions. We cannot say, as a matter of law, that plaintiff's evidence lacks probative strength and, therefore, must hold that its weight, as well as the issue of the credibility of plaintiff's witnesses were issues of fact which have been definitely and irrevocably settled by the verdict. We must assume that the engineer negligently violated a known and invariable custom in starting the train without a signal from the head brakeman or conductor and on no other signal than that from the semaphore.

But it is argued that Haines was not in the discharge of any duty of his service at the time of his death. There is evidence to support a conclusion that he was drunk and without any reason deliberately crawled under the car; but there is abundant evidence that he was sober and had not drunk from the jug, and there is some evidence, i. e. the testimony of Calder, that there was a leak in the air hose which it was the duty of Haines to try to repair. The engineer and fireman say there was no such leak and that the indicator in the cab of the engine showed the line of air hose was sound and intact. Counsel for plaintiff point to the failure of defendant to introduce as witnesses the inspectors who must have inspected the

hose shortly after the arrival of the train at Trenton. Here again we would say that the evidence of defendant has the greater force but that of plaintiff is substantial and we are bound by the verdict to accept it.

From Calder's testimony it appears that Haines said the air had been leaking before the train reached Tindall. If that is so it is hard to understand why Haines waited almost four hours, and until the coming of the limited was signalled, before starting out to find where the leak was, its nature and seriousness and what would be required in effort and time to remedy it. This, we think, is the weakest part of plaintiff's case. Aside from the conclusion, which seems indisputable, that Haines negligently delayed attending to a most important duty until the last minute, the fact that he was so negligent had a strong and, to us, persuasive, evidentiary bearing on the issue of whether or not there was a leaky hose which he started out from the engine to repair before going to the switch. But such negligence must be regarded as a remote and not a proximate cause of the injury which was superseded in the chain of events by the negligence of the engineer in starting without a signal from Haines (the conductor does not appear to have been at a place to signal) and while, as we say, this negligence has a strong evidentiary bearing on the issue of whether or not he was in the discharge of a duty when he crawled under the car, it is not conclusive and the question was resolved by all the evidence into one of fact for the jury to determine. In reaching these conclusions we have left out of consideration the declaration Calder says Haines made about where he was going and for what purpose. If that testimony was admissible it adds weight to plaintiff's side of these controverted issues. Counsel for defendant contend with much force that such evidence

was the most obvious hearsay and that its admission over the objection of defendant was reversible error. [Citing Johnson v. Mason, 178 Mo. App. 109; Torreyson v. Turnbaugh, 105 Mo. App. 439; Clark v. Cox, 118 Mo. 652; Whimster v. Holmes, 177 Mo. App. 130; Council v. Railroad, 123 Mo. App. 432; State v. Shermer, 55 Mo. 83; Gibony v. Foster, 230 Mo. 106.]

In State v. Shermer, it is held that in a prosecution for grand larceny the defendants could not make evidence for themselves by adducing their own declarations explanatory of their motives and designs which were made when they were about to leave home with the property they were on trial for stealing.

In Clark v. Cox, a replevin suit for a stock of goods, a sale of the stock under a deed of trust executed by Swike, the owner, was attacked by defendants who were attaching creditors of Swike on the ground of fraud between him and plaintiff, the purchaser at the sale. The defendants who lost the case in the circuit court argued, on appeal, in favor of the competency of statements made by Swike to various witnesses both before and after the sale under the deed of trust. The court held "this evidence was not admissible unless there was shown to exist a conspiracy between the plaintiff and Swike at the time of the purchase of the goods by him," and ruled the evidence was properly excluded, since there was no proof of such conspiracy.

Gibony v. Foster was a contest over a will in which it was sought to be shown that the will was the result of undue influence exerted over the testatrix by her daughter, Mrs. Bonfield. Numerous witnesses testified "as to what Mrs. Bonfield said she was going to do and had done in the way of getting her mother to dispose of her property." The Supreme Court pronounced such testimony nothing more than hearsay.

In Torreyson v. Turnbaugh it is held that statements of a defendant in an attachment suit are not admissable as against the interpleader.

In Council v. Railroad, we ruled that testimony of a general report or reputation that an infectious disease existed at a given place and time was hearsay and inadmissible since such a fact belonged to a class susceptible of proof by better evidence.

In Whimster v. Holmes, evidence of what a chauffeur said about his purpose to use his master's car for his own convenience or pleasure is denominated as hearsay falling under the general rule excluding such evidence.

The citation in Johnson v. Mason refers to a reaffirmation in a concurring opinion of the rule applied in Torreyson v. Turnbaugh, supra.

The rules of these cases proceed from the doctrine that hearsay evidence should not be admitted either to prove an alleged act or a quality of an act where such classes of acts or qualities are susceptible of proof by better evidence. And if the alleged declaration is of a self-serving character, that is another and a very strong reason for refusing to exempt it from the hearsay rule. [Secs. 2734 and 2757 Chamberlayne on Evidence; Hitt v. Hitt, 150 Mo. App. 631; State v. Jacobs, 133 Mo. App. 182.] But the authorities reviewed do not disavow any of the well-recognized exceptions to the hearsay rule. One of these familiar exceptions is that declarations which are a part of the *res gestae* are admissible for the reason that all the things done, including words spoken, in the commission of the act, brought under judicial investigation, are of the very subject-matter of the cause. Where what a man says is a part of his act which gives rise to the controversy, necessarily, it is of the *res gestae* and admissible, since the triers of fact are entitled to have all of the facts of the subject-

matter brought to them in the evidence. As is said in Greenleaf on Evidence, sec. 108:

"These surrounding circumstances, constituting parts of the *res gestae,* may be always shown to the jury, along with the principal fact; and their admissibility is determined by the judge, according to the degree of their relation to that fact, and in the exercise of his sound discretion, it being extremely difficult, if not impossible, to bring this class of cases within the limits of a more particular description. The principal points of attention are, whether the circumstances and declarations offered in proof were contemporaneous with the main fact under consideration and whether they were so connected with it as to illustrate its character . . . 'Many acts are in themselves of an equivocal nature and the effect of them depends upon the intention or disposition from which they proceed, which is in general best determined by the expressions accompanying them.' " Further on, the author observes: "What a man says when he does a thing, shows the nature of his act and is a part of the act; it determines its character and effect."

16 Cyc. 1148, et seq., defines the phrase *res gestae* to embrace all facts which are revelant to the principal fact in any degree as tending to establish the existence of the claim or liability in dispute which directly arises, if at all, from the primary facts and states as a rule that "however the limits of the res *gestae* are fixed, it may be broadly stated that within these limits a tribunal will hear everything which is relevant that has been said or done. In considering the fact, so segregated, no distinction can be, or indeed usually is, drawn between statements and acts. In reality, except so far as relates to the truth of the assertion, a verbal act does not essentially differ from any other."

Our Supreme Court in State v. Kennade, 121 Mo. l. c. 413, gave full recognition to this doctrine: "The occurrences in the saloon just a few minutes before the homicide, as related by Bass, elucidating as they did, the subsequent criminal transactions and giving to them their proper complexion and expression, constituted part of the *res gestae* and were therefore competent evidence. . . . One of the most important things to know in the whole matter to be investigated was the *quo animo* the defendant began the quarrel with Morris," etc.

In Hodges v. Hill, 175 Mo. App. 441, a damage suit, one of the issues was whether or not plaintiff's son was negligently driving at high speed. It was held that declarations of the son on starting out that he was in a hurry and the horse was a fast traveller were admissible, the court saying "these statements of the son are so intimately connected with his riding home as to be a part of the res gestae."

In Knoche v. Knoche, 160 Mo. App. 257, we held that everything that occurred at the altercation preceding the assault in question was of the *res gestae.*

Where a decedent was killed at a station where he went to take a train his declarations before setting out on his journey were held competent evidence as being of the *res gestae.* [Railroad v. Bell, 65 So. Rep. 835.] Other cases to the same effect are Railway v. Howard, 19 Am. St. Rep. 96; Terminal Co. v. Stone, 118 Fed. Rep. 19; State v. Lucey, 24 Mont. 295; Railway v. Herrick, 29 N. E. 1052; Bradley v. Modern Woodmen, 146 Mo. App. 428.

In the case last cited Judge Goode says: "An exception was saved to the admission of the statement of Mills when he left home for the purpose of his trip and when he would return. The contention is he might be prosecuted for abandoning his family and if he meant to do so, those declarations were self-ser-

ving. In our judgment the right rule to apply is the one thus stated by a learned commentator: 'When ever the demeanor of a person at a given time becomes the object of inquiry, his expressions, as constituting part of that demeanor, and as indicating his present intent and disposition, cannot be properly rejected in evidence as irrelevant.' [Evans' note to Pothier on Obligations 11, 242.] That passage is quoted in 1 Greenleaf 16 Ed.), sec. 108, and shown to be applicable to numerous instances, including those where a person 'is upon a journey or leaves home, or returns thither, or remains abroad.' The rule was followed in every case cited, supra, and the point was passed on in Carpenter v. Sup. Council, 79 Mo. App. 597, 603. If the statements of an absentee concerning why he was leaving home are excluded from the jury, they will be deprived of illuminating evidence upon the main inquiry.''

We think these authorities sustain and compel the conclusion we have reached that Haines' declaration when he and Calder left the engine to go upon the discharge of their respective duties that he first would go to fix a leak in the air hose, was a part of the *res gestae* relating to the constitutive fact of whether Haines was in the discharge of duty when killed or had disgressed and was where he should not have been. The act which ended in his death had begun when he started from the engine and was in progress when he made the alleged declaration which was a verbal part of the main act as that term is defined in the quotation from Greenleaf.

The preceding statement made by Haines while he and Calder were walking from the depot to the engine, to the effect that the hose had been leaking on the way to Tindall was not admissible under the doctrine we have discussed and accepted, for the reason that it cannot be regarded as a verbal part of the main

fact which, as stated, was whether or not Haines on starting from the engine proceeded to the discharge of duties relative to preparing to move the train as soon as the limited cleared the track, or forsook the path of duty to go on some errand of his own. A declaration made so long before and so disassociated from the performance of the principal act could not be regarded as contemporaneous, as that term is used in Greenleaf, with the main fact and, therefore, should be treated as mere hearsay. But no exception was saved to this part of Calder's answer. The question called only for the conversation which the witness had with Haines as they parted, after leaving the engine, and the objection to that question, as we have shown, was properly overruled. The answer, in part, was responsive to the question but also included the unresponsive and improper statement under consideration.

The only way improper matter in an answer to a proper question may be reached is by motion to strike out such matter. An objection goes to the question and frequently does not direct notice to the answer. The trial court must be given opportunity to correct errors as they arise and the objection to improper matter in an answer to a proper question if not raised by motion to strike out will be deemed waived. [Waddell v. Railroad, 113 Mo. App. 687, and cases cited.]

We find no prejudicial error in the record. The motion to make the petition more definite and certain was properly overruled. The judgment is affirmed.

All concur.