Emma Decker v. Raymond Concrete Pile Company, Employer, and The Ocean Accident and Guarantee Corporation, Limited, Insurer, Appellants.—82 S. W. (2d) 267.

Division Two, May 7, 1935.

*Henry S. Conrad, L. E. Durham* and *Hale Houts* for appellants.

(1116)

*Hyde & Fischer, Hook & Sprinkle* and *Paul C. Sprinkle* for respondent.

1118

WESTHUES, C.—Respondent, as the widow of Ray Decker, filed a claim with the Workmen's Compensation Commission seeking to recover compensation for the death of her husband. The commission heard the case and denied respondent compensation on the theory that the death of Decker was not the result of an accident arising out of and in the course of his employment, but was entirely due to other causes. Respondent appealed to the Circuit Court of Jackson County where, by a judgment entered, the award of the commission was set aside and the commission ordered to enter an award allowing compensation. From this judgment defendants appealed.

If compensation were allowed the amount would exceed $7,500, hence appellate jurisdiction in this court. The evidence disclosed that during the month of July, 1931, and prior thereto, deceased was employed by the Concrete Pile Company. On July 7, deceased, in line with his regular duties, used an acetylene torch to melt metal. This work was performed in the open air near the Missouri River in Kansas City, Missouri. That same evening deceased became ill and called a doctor. On examination, by a physician, it was disclosed that deceased was suffering with edema of the lungs. A later examination also disclosed that deceased was then suffering, and had prior thereto suffered with heart trouble, referred to by the physician as myocarditis. The physician in charge testified that he made an examination to determine the cause of the edema of the lungs. After some questioning the patient informed him that he had inhaled and smelled gas which produced a headache and that a leak existed in the acetylene tank. The doctor testified that in his opinion the edema was caused by the inhaling of poisonous gas fumes. Deceased spent a week or more in a hospital, but later went to work for a few days. A claim for compensation was made, allowed and paid. On the 29th day of October of the same year deceased was again taken to a hospital where he died the following day. Claimant's contention before the commission was that death was at least partially due to the inhaling of gas, by deceased, on July 7. Defendants' contention was that death was solely due to deceased's heart condition. Each side offered evidence in an endeavor to substantiate their respective theories. The commission found, as indicated, that death was the result of other causes and not the result of an accident. The circuit court set aside the order of the commission on the theory that the record did not contain sufficient, competent evidence to sustain the award.

The sole question before us is whether the trial court was justified in setting aside the award made. An award of the Compensation Commission is in law regarded as a special verdict and if supported by *substantial, competent* evidence it must prevail. [Leilich

v. Chevrolet Motor Co., 328 Mo. 112, 40 S. W. (2d) 601, l. c. 604 (4, 5).; Jackson v. Curtiss-Wright Airplane Co., 334 Mo. 805, 68 S. W. (2d) 715, l. c. 719.] The Compensation Act has been and should be liberally construed. If doubt arises it should be construed in favor of the employee. [Betz v. Columbia Tel. Co. (Mo. App.), 24 S. W. (2d) 224, l. c. 228 (2-8); Pruitt v. Harker, 328 Mo. 1200, 43 S. W. (2d) 769, l. c. 773 (4, 5); Schulz v. Great Atl. & Pac. Tea Co., 331 Mo. 616, 56 S. W. (2d) 126, l. c. 128 (2, 3).]

With the above rules of law in mind let us examine the record to determine the question of the sufficiency of the evidence to sustain the award. The record discloses, and we will assume for the purpose of this case, that claimant adduced substantial, competent evidence to support an award of compensation. It will, therefore, not be necessary to review at length the evidence introduced on behalf of respondent. Appellants' witness, Dr. Black, examined deceased, August 11, 1931, and obtained from him a history of his illness. This witness testified in part as follows:

"Q. All right—now go ahead and tell the Commissioner what conclusions you came to as result of your examination which you made August 11th. A. Well, the way I concluded the man was suffering with a heart condition; at the time I saw him, he had a very definite evidence, both as to physical findings, together with history he gave which was typical history we find in heart cases; had shortness of breath and expectoration of bloody .frothy spectum happens daily many times—very frequently I will say, they have heart disease and it's looked upon—at least I look upon it—as some of the premonitory or first findings that you find in the case of heart decompensation where the heart is lagging or failing, little shortness of breath when he exercises and expectoration of bloody frothy sputum or saliva which is perhaps result of pulmonary edema which you find very frequently as early sign of cardiac decompensation; this man had this clogging or percussion of the chest; he had, as I have made report, enlargement of heart to right . . ."

"Q. Now, was it evident to you from that examination that he must have been suffering from this heart trouble for some considerable period of time? A. Yes, sir, from physical findings increase in the size of the heart both on percussion and X-rays, these things don't happen over night or few days, heart had been repeatedly perhaps put to overwork and exertion and gradually had enlarged.

"Q. A long developmental process? A. Over long period of time.

"Q. About how long, months or years? A. Well rather difficult to say but certainly over period of at least months, perhaps years, those things don't happen in a few weeks or few days.

"Q. In case of a heart of that character do patients frequently come down with a heart attack with symptoms such as he outlined to

you as having experienced on July 7th? A. Yes, very frequently, very common history elicited from patient with heart condition as this man had."

On cross-examination he testified:

"Q. Can you assume a man did have condition of pulmonary edema, or he had had it prior to your examination to the extent you found some evidence of it there? A. Yes, sir.

"Q. Don't you know that pulmonary edema is one of the primary results of inhalation of poisonous gas? A. Well, can you specify the gas?

"Q. Carbon monoxide, or any irritant gas? A. Well, of course if in sufficient concentration perhaps would produce irritating effect.

"Q. It is a fact will produce— A. If in sufficient concentration.

"Q. And man gave history of having inhaled some gas? A. He did.

"Q. Then, how can you say as a positive fact that this gas had nothing to do with pulmonary edema? A. From history; he disclosed how he inhaled it and amount of gas and his location—he was out of doors—I just can't conceive of it being concentrated enough to produce any irritating effect."

Dr. Davis, who had had considerable experience with acetylene gas, testified as follows:

"Q. During the war, state what connections you had with it. A. It was after the war; I had charge of the medical work down at the Sweeney Automobile School from March, 1919 to 1924, and seen about 2,000 men go through that place and took absolutely no precaution in working department and never saw a fellow complain of acetylene poisoning, or any symptoms of it.

"Q. Working department in separate department? A. Separate department; all departments different.

"Q. Indoors? A. Indoors, no more ventilation than just a room, like this.

"Q. State how they used that acetylene, burning torches— A. Burning regular welding torch, oxygen in one channel and acetylene in the other.

"Q. Would you say how many been burning at one time? A. Had about twenty of them down there and I have seen all twenty going at one time.

"Q. In addition to the use which they put these torches to, state what, if anything, you have seen them do with reference to use of acetylene when not lighted. A. Take acetylene—tell when present by smelling and I have smelled the stuff and you can recognize it by the odor but far as having any ill effects, I never seen any ill effects from it."

· It was the, opinion of this witness that even if there was incomplete and improper combustion in the operation of an acetylene torch, due to a leak of oxygen, and as a result carbon monoxide was formed, it could not be injurious to a person operating a torch in the open air. It may be noted here that there was a small leak in the acetylene gas supply tank and not in the oxygen supply feeding the torch with which deceased was working.

In the opinion of Dr. Helwig, who specialized in pathology, deceased's death was due entirely to a diseased condition of the heart. It was also Dr. Helwig's opinion that Decker's sickness in July was due to the heart condition and not to the inhaling of gas. Note the following testimony:

"Q. In your opinion—as you say there are sometimes minute quantities of carbon monoxide or sulphine or arseniureted hydrogen, hydrogen sulphide—and would an imperfect combustion in the acetylene tank out in the open, state whether or not, in your opinion, that could possibly have any effect upon a human being? A. I don't think have the slightest.

"Q. That because of the oxygen surrounding it? A. Because of quick diffusion of gases in surrounding atmosphere.

"Q. I believe you have stated that the findings in this case are typical of those of a slowly progressing lesion of long standing? A. Yes.

"Q. Mr. Fischer has asked you about these poisons that might exist in the gases; is there anything in the autopsy report which shows that they did exist with him? A. Isn't the slightest evidence at autopsy to suggest that the man was poisoned by any gas, the lesion that caused his death is very obvious."

James I. Banash, a man of many years experience in testing acetylene appliances, testified that acetylene gas, as now manufactured,. is in itself harmless unless taken in such large quantities as to produce unconsciousness; that it is a sedative and acts as an anaesthetic and not an irritant. There was other evidence tending to prove that acetylene gas in itself is a sedative and not an irritant and that inhalation of such gas could not produce edema of the lungs.

The evidence referred to, in our opinion was competent and substantial and went to the point at issue. The commission was, therefore, authorized to make the finding it did and we are without authority to disturb the award made. In so holding we have not overlooked the contention, made by respondent, that if the inhalation of gas by deceased, as alleged to have occurred on July 7, was a contributing cause of deceased's death claimant was entitled to compensation. Such is the rule. [DeLille v. Holten-Seelye Co., 334 Mo. 464, 66 S. W. (2d) 834,.1. c. 835, 836 (2, 3) ; Harder v. Thrift Const. Co. (Mo. App.), 53 S. W. (2d) 34, 1. c. 37 (8).] However, if the

evidence introduced by appellants is to be believed, the inhalation of gas, by deceased, did not contribute to deceased's death, but such death was entirely due to a bad heart. Claimant's main witness, Dr. O'Connell, who had waited on deceased, signed a death certificate which stated as the cause of death the following:

"The principal cause of death and related causes of importance were as follows: Arteriosclerosis coronary occlusion.

"Other contributory causes of importance: Multiple cardiac infarcts and cardeal *defitation*.

"Name of operation: None.

"Was there an autopsy? Yes.

　　　　　　　"(Signed)　P. J. O'CONNELL, M. D.,
　　　　　　　"(Address) ·3046 Main, K. C." (Italics ours.).

Dr. Helwig testified the word *defitation* was an error probably made in copying the report and that it should be *dilatation*. Webster's New International Dictionary confirms Dr. Helwig. Dr. O'Connell also testified that while it was his opinion the edema of the lungs was caused by the inhalation of gas, it could have been caused by the condition of the heart.

Considering all of the evidence in the record, it is our opinion that the award of the commission is supported not only by substantial, competent evidence but by a preponderance thereof. Such being the case, it follows that the judgment of the lower court must be reversed and the cause remanded with directions to the circuit court to enter an order affirming the award of the commission. It is so ordered. *Cooley* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.