MARY E. EDWARDS and WALTER J. EDWARDS v. ETHYL GASOLINE CORPORATION, Employer, and TRAVELERS INSURANCE COMPANY, Insurer, Appellants.—112 S. W. (2d) 555.

Division One, January 25, 1938.

*Mosman, Rogers, Bell & Buzard* for appellants.

100

*Nelson S. Riley* and *Roberts & Tracewell* for respondents.

FERGUSON, C.—L. S. Edwards a resident of Kansas City, Missouri, was a "field representative" and "salesman" for the Ethyl Gasoline Corporation. He worked out of and under the supervision of the division offices at Kansas City. Edwards was killed at about seven P. M. September 5, 1934, near Coffeyville, Kansas, when an automobile which he was driving collided with another automobile and was destroyed by fire. His widow, Mary E. Edwards, and minor son, Walter J. Edwards, made claim, under the provisions of the Workmen's Compensation Act, for compensation, on account of his death. Upon a hearing on the claim the Compensation Commission made an award in favor of claimants, allowing $150 for burial ex-

penses, and death benefits in the amount of $8076 payable to the widow Mary E. Edwards in the sum of $20 per week for 403.8 weeks "or until her prior death or remarriage, then the remainder to Walter J. Edwards, son of deceased." The employer and insurer appealed to the Circuit Court of Jackson County where, upon review, the award made by the Compensation Commission was affirmed and judgment entered in accordance therewith. The employer and insurer bring this appeal from the judgment of the circuit court. Appellants' several assignments of error are directed to the ultimate contention that there is not sufficient, competent, and substantial evidence tending to show that Edwards' death was "by accident arising out of and in the course of his employment." [Sec. 3301, R. S. 1929.]

Edwards resided in Kansas City, Missouri. He was employed by the Ethyl Corporation in September, 1933, as "a field representative" and salesman in its "sales division" and thereafter continued in that employment until his death. Harold R. Berg was sales division manager with headquarters at Kansas City. The division included the states of Colorado, Kansas, Missouri, Nebraska, and Iowa, but not the State of Oklahoma, which was in another division. His duties were varied. The evidence, and mostly that on the part of the employer and insurer, shows that Edwards' service to the Ethyl Corporation as field representative included the following activities: "making jobber investigations," "pump inspections," "picking up samples," "call on automobile agencies," "inspect mixing plants," "visit refineries," interest "automobile distributors" and "oil men" in Ethyl products, "entertain prospects," at all times and generally to "secure information pertaining to distributor's of automobiles or high compression motors" and seek to interest them in Ethyl products, and "explore leads or information" that might contribute to the furtherance of the business of the Ethyl Corporation and the sale and distribution of its products. The evidence tends to show, and is of such nature that the Compensation Commission, as the trier of fact, could well find therefrom, that in performing the general services last mentioned, and indeed all of the duties of his employment, Edwards was allowed "a certain amount of discretion," "within reasonable limits," and that his manner of performing these services was "discretionary according to the conditions at a particular time" and "his judgment." Edwards had no fixed or regular hours of work. When traveling about the division he carried on both the specific duties in which he was at the time engaged and the general duties or services of furthering his employer's business as and when opportunity afforded day or night. Nor did he have a regular, prescribed territory or itinerary; while he worked mostly in western Missouri and Kansas he was also sent, at times, into Nebraska and Iowa. The Ethyl Corporation furnished him an automobile in which to travel. As an

incentive to its sales and field representatives to promote and advance its business, form new contacts and secure new business, the Ethyl Corporation offered them an annual bonus. The bonus payment was governed by a rating arrived at upon a consideration of numerous factors such as "ability" and "attitude," by which was meant "attitude with reference to promoting the interests of the Ethyl Corporation." From both admissions and evidence it appears that Edwards was assiduous in the performance of all the duties and services to the Ethyl Corporation mentioned and that in traveling about the territory he was constantly alert and devoted to the furtherance of its business and interests. Nor does it appear that he was given to personal diversions. He seems rather to have constantly busied himself about the employer's business and the promotion and furtherance thereof.

Having sketched the nature of his employment and the services he was expected to render we come to the events immediately preceding the death of Edwards as shown by claimants' evidence, supplemented at some points by evidence introduced on the part of the employer and insurer. Edwards was on a trip in Kansas. He had been directed before returning to the Kansas City offices to go to Coffeyville, Kansas, "to investigate" a Mr. Kirkpatrick "an oil and gasoline jobber" in that city. This is what was known as a "jobber investigation." Berg, the division sales manager, explains: "All oil jobbers who sell gasoline containing our products must be licensed by our company to do so. Before licensing them we have one of our men" make an investigation. When he had completed his work at Coffeyville, Edwards was to go to Joplin, Missouri, and thence return to division headquarters at Kansas City. The automobile collision which resulted in his death occurred about seven P. M., Wednesday, September 5, 1934. On the preceding Thursday the company automobile in which he was traveling had "broken down" near Hillsboro, Kansas, and, as extensive repairs were necessary requiring considerable time, Edwards left the company automobile at Hillsboro for repairs and continued his trip by bus. He arrived in Coffeyville, by bus, about three-thirty the afternoon of September 5, went to the Dale Hotel, registered and was assigned to a room. At the time he was carrying only "a zipper brief case." It appears by stipulation that Edwards used this brief case for carrying files, records, "charts, documents, data," and various report forms relating to company business. His "traveling bag" arrived at the hotel, on a later bus, about four-thirty P. M., and was sent to his room. Upon calling at Kirkpatrick's place of business Edwards learned that Kirkpatrick was out of town for the day. Prior to his employment by the Ethyl Corporation Edwards had worked for the Studebaker Corporation "as service manager out of Kansas City." About four o'clock that afternoon Floyd Graham, "Studebaker distributor" at Coffeyville, a "close friend"

of Edwards, met him on the street near the hotel. After some conversation of a general nature Graham asked Edwards "how long he was going to be in town" and Edwards said: "I have a report to make on Kirkpatrick" and that "he (Edwards) was trying to locate him;" that "he understood Kirkpatrick was out of town . . . hunting same place," and then inquired: "How can I get to Joplin if I locate Kirkpatrick this afternoon?" Graham said there was no bus leaving for Joplin until ten o'clock that night but that if he could arrange to do so he would take Edwards to Joplin if he should decide to go there. However, as stated, Edwards later learned that he would not get an interview with Kirkpatrick until the next day. Ben H. Haston, the "Studebaker distributor" at Bartlesville, Oklahoma, had come to Coffeyville, Kansas, to deliver a Studebaker truck, out of his stock, to Graham, the local dealer, above mentioned. Haston had been well acquainted with Edwards when Edwards was with the Studebaker Company. About, or shortly before, six-thirty P. M. Haston met Edwards at the Dale Hotel. A general conversation followed relating to their respective lines of business. Edwards inquired specifically about Bert Linn (connected with the automobile business) and Frank Wall, both of Bartlesville, and whether "Wall was still in the garage business" there, to which inquiry Haston replied in the affirmative. Thereupon Edwards inquired, "if Wall still had the same clientele with oil companies" that he formerly had and Haston told him, that "he (Wall) did." Edwards then said: "Well he (Wall) should be able to do me some good," that Linn and Wall "are good friends of mine and have always helped me in any way they could," and "if I can get a car, I will go over and see them." Shortly thereafter, about six-forty-five P. M. Edwards, at the hotel, called Graham, by telephone, at his place of business, and said: "I have got to go to Bartlesville on some business, will you loan me an automobile." Graham told Edwards he would loan him an automobile, and Edwards said: "I'll be right up." It was three blocks from the hotel to Graham's place of business. At the conclusion of the telephone conversation Edwards left the hotel for Graham's place of business. One Thompson was employed by Graham. After the telephone conversation Graham told Thompson that Edwards would come for an automobile and directed Thompson to let Edwards have a certain, designated automobile whereupon Graham "went home to eat." Shortly thereafter, "about 10 minutes before 7," Thompson estimates, Edwards arrived at the Graham place of business and Thompson delivered the automobile to him. At that time and in the course of the conversation with Thompson, Edwards stated, that "he was going to Bartlesville on company business" and that "he was in a hurry to get started to Bartlesville as he had a couple of men to see and wanted to get back as soon as possible." Leaving the Graham place of business in the automobile Edwards drove to a filling sta-

tion, situate across the street from the hotel, for "oil and gas." While the automobile was being serviced at this filling station one Fred Walton, an employee at a local garage, passed. Edwards hailed Walton, inquired about his employer, and told Walton to tell his employer, the owner of the garage, "to be at the station tomorrow as I want to see him" and added, "I'm going to Bartlesville on business tonight." Edwards then went into the hotel. At the hotel he inquired of Haston as to how he could get in touch with Linn and Wall at Bartlesville and sent a bell boy to his room for the brief case, heretofore mentioned in which he carried data and printed matter appertaining to company business. The bell boy delivered the brief case to Edwards who was "standing by the desk" and Edwards thereupon and immediately got into the automobile and drove away from the hotel. The evidence does not clearly and definitely show whether Edwards checked out of the Dale Hotel but is such, we think, as would warrant an inference, by the trier of fact, that he did not and that he left his suit case containing his personal effects at the hotel taking only the brief case with him. The record shows the following question propounded to the bell boy, witness for claimants, and his answer, on cross-examination: "Did he check his suit case out of the hotel? A. No sir, I don't." The "charred" and partly burned brief case was taken from the automobile. None of the several witnesses, policemen, firemen and others who went immediately to the scene of the collision and fire, testified that a suit case was in the automobile though all saw the brief case which was taken from the automobile. This brief case, and its remaining contents, was introduced in evidence. The collision in which Edwards was killed occurred within five to ten minutes after he drove away from the hotel, at a point on Highway 166, about two and one-half miles west of Coffeyville. In traveling Highway 166 to Bartlesville he would have passed through Caney, Kansas. As the writer understands the evidence there was another and shorter route to Bartlesville which did not pass through Caney, Kansas. However, the route via of Highway 166 through Caney was the "main traveled road." There is evidence that Edwards made inquiry as to whether he could "go through Caney, Kansas" on his way to Bartlesville and signified a desire to go that way, and that the Ethyl Corporation had business interests at Caney which he might have deemed it advisable to give attention. There is no question however that he left Coffeyville to go to Bartlesville, Oklahoma.

The employer and insurer offered evidence purporting to show that Edwards had no right or authority in, or to go into, another division in connection with company business and that his authorized activities were limited to the division to which he as a field representative was assigned and further that his use of a private automobile was in violation of instructions. As to the first proposition it

was claimed that since the State of Oklahoma is in the Tulsa division and not in the division to which Edwards was assigned as a field representative he had no authority to transact business for the company in Oklahoma. This may well be true so far as making sales, adjustments, contracts or inspections but claimants argue that it is a reasonable and fair inference that Edwards was making this trip, in the exercise of his general duties, for the sole purpose of obtaining information leading to contacts which might assist him in the promotion and advancement of the company's business in his own division, what is termed in the evidence as "exploring leads." In support of their contention that it was not permissible, under any circumstances, for a field representative to go outside his division without first obtaining the approval of the "head office" and granting that Edwards was making the trip in the interest of the company's business it was nevertheless in violation of instructions, the employer and insurer offered in evidence a letter of date of June 19, 1931 (more than 2 years before Edwards was employed) from the New York office of the Ethyl Corporation directed, "To all Division Managers." This letter relates to "holding down expenses to a minimum" and complains that district managers had been wont to make "unnecessary" trips into other divisions and outside their territory at the company's expense and concludes: "This letter will therefore advise you that in the future neither Division Managers or field representatives are to leave their territories without submitting to the head office the reason for proposed trips and securing our approval. This policy will also apply to vacation periods. In other words, we wish to know when Division Managers and their men are planning on being absent from their territory." There is no evidence that this notice in 1931 to the division managers was promulgated to the field representatives at that time or later as a rule or regulation within this division applying to them. It is admitted that Edwards, employed more than two years later, was not advised orally of such a rule and the uncertainty attending the testimony about the matter was such that the trier of fact might well have found that neither the foregoing letter, nor any rule based thereon, was ever brought, in any way, to Edwards' attention. Berg the division manager also stated in a general way that it was "contrary to the policy" of the company for its field representatives to use private automobiles for their travels. Claimants, however, had evidence that Edwards had, at times, used his wife's automobile on company's business with Berg's knowledge and on the question generally there was a conflict in the evidence making it a question of fact for the trier of fact.

■ The employer and insurer objected and excepted to the admission in evidence of the various statements and declarations by Edwards in reference to the purpose of his trip to Bartlesville, which claimants' witnesses related, and as appellants contend here that

their admission was error and that such testimony is hearsay, incompetent, and should not be considered in determining whether there is sufficient and substantial evidence tending to show that at the time of his death Edwards was engaged in the employer's business or service and acting within the course of his employment. The inquiry then is, were such statements and declarations admissible? The conversation with Haston at the hotel about six-thirty P. M. when he made the inquiries and expressed a decision to go to Bartlesville tend to some extent to show his intention and purpose in making the trip. The telephone call to Graham, shortly and almost immediately following the conversation with Haston, when Edwards, stating that he had "to go to Bartlesville on some business," asked and was granted the loan of an automobile, the statements to Thompson, at the Graham place of business, within a few minutes thereafter, as Thompson delivered the automobile to him, that, "he was going to Bartlesville on company's business, . . . was in a hurry to get started" and that he "had a couple of men to see" there, and the subsequent statement to Walton, at the filling station, a few minutes later, all followed in a continuous and unbroken sequence his conversation with Haston, evidenced the carrying out of the decision and intention at that time expressed, and were explanatory of, and tended to show, the intention and purpose of the trip to Bartlesville. The trip may reasonably be considered to have commenced with the loan of the automobile for he was thereafter continuously and solely engaged in that connection. He went immediately, following the telephone conversation with Graham, the three blocks to the Graham place of business and got the automobile and there was no diversion thereafter; so the statements last mentioned were in fact contemporaneous in time with and immediately accompanied the main event, or disputed act, that is, the trip upon which he was embarked when he was killed.

The circumstances under which the statements were made preclude any idea of deliberate and self-serving design, nor is anything to be found in the evidence lending color or semblance to such idea. At Section 161, Ruling Case Law, a general rule is stated thus: "Declarations made immediately preceding a particular litigated act, which tend to illustrate and give character to the act in question are admissible as part of the *res gestae*." We find a very general recognition of the admissibility of this type of evidence as illustrated by the following, among numerous cases that might be cited. The declarations of a physician on leaving home, taking medicines with him, as to the place he was going and the purpose of his visit there were held admissible "on the principle of *res gestae*," in Antanga County v. Davis, 32 Ala. 703. A statement by a plaintiff shortly before he fell from an unlighted railroad station platform and was injured that he was there to take an incoming train was held admissible as a part of the *res gestae* in Chicago, M. & St. P. Ry. Co. v. Chamber-

lain (C. C. A. 9th Cir.), 253 Fed. 429. Likewise, in Railway Company v. Herrick, 49 Ohio St. 25, it being material to establish that plaintiff, injured at a railroad station, intended to take passage on one of defendant railway company's trains a declaration, made by him as he left his home on his way to the station, that he was going to another station on the same railroad was held competent to establish his character as a passenger. [See, also, Central of Georgia Ry. Co. v. Bell, 187 Ala. 541, 65 So. 835.] In May v. Chicago, B. & Q. Railroad Co., 284 Mo. 508, 225 S. W. 660, the plaintiff, a married woman, was injured in attempting to board defendant's train. She had waited at the railroad station where she intended to board one of defendant's trains due within a short time while her husband "went uptown to make some purchases." She anxiously awaited his return and it was defendant's contention she waited too long and tried to board the train after it had begun to move. A statement by her husband when he entered the last store he visited that he was in a hurry and that his train was at the station having been made at a place from which the train and station could be seen and being "practically contemporaneous with the main event" was held competent on behalf of defendant. Bradley v. Modern Woodmen of America, 146 Mo. App. 428, 124 S. W. 69, was an action by a wife on a policy of life insurance issued to her husband and in which she was the beneficiary. More than seven years prior to the commencement of the action the husband had left home purportedly to make a trip in the prosecution of a business he was at the time pursuing. He was not thereafter heard of and diligent efforts to obtain information concerning him, and his disappearance, were unavailing. It was held that declarations made by the husband, when he left home, as to the purpose of his trip and when he would return were admissible. Defendant made the contention that as the husband "might be prosecuted for abandoning his family, and if he meant to do so, such declarations were self-serving." The Court of Appeals held that the declarations were admissible as tending to show "his present intent" and as "illuminating evidence upon the main inquiry." We might here observe that declarations or statements which are part of the res gestae "are not rendered inadmissible by the fact that they are also self-serving." [22 C. J., p. 230.] Haines v. Chicago, R. I. & P. Ry. Co., 193 Mo. App. 453, 185 S. W. 1187, was an action for damages for the death of a brakeman. Haines, the deceased brakeman, visited in the engine cab of a standing train with another brakeman, Calder, as they waited for the signal of the approach of another train whereupon they left the engine cab to go about their separate duties. As Haines left the cab he "remarked that he was going back to fix the air hose." They had previously noticed a "leak in the air hose" of the train. The Court of Appeals said: "Haines' declaration, when he and Calder left the engine to go upon the discharge of their re-

spective duties, that he first would go to fix a leak in the air hose, was a part of the *res gestae* relating to the constitutive fact of whether Haines was in the discharge of his duty when killed, or had digressed, and was where he should not have been. The act which ended in his death had begun when he started from the engine, and was in progress when he made the alleged declaration." We find the general rule governing the admissibility of declarations and statements such as are involved in the instant case well stated by the Supreme Court of Indiana in Hinchcliffe v. Koontz (Ind.), 23 N. E. 271, as follows: "Declarations made contemporaneously with, or immediately preparatory to, a particular litigated act, which tend to illustrate and give character to the act in question, are admissible as part of the *res gestae*. . . . The character and purpose of an act are frequently indicated by what is said by the person at the time, or while in the immediate preparation to do the act." [See, also, 3 Jones Commentaries on Evidence (2 Ed.), sec. 1218 and sec. 1220; 22 C. J., p. 453; Hodges v. Hill, 175 Mo. App. 441, 161 S. W. 633; Knoche v. Knoche, 160 Mo. App. 257, 142 S. W. 766; Cincinnati, I., St. L. & C. Ry. Co. v. Howard, 124 Ind. 280.] The cases cited by appellants for the most part deal with statements made subsequent to the main event or litigated act, which being mere narration of a past event were held not to be a part of the *res gestae*. Such cases are not applicable here. It is our conclusion that Edwards' declarations and statements set out, supra, made at the time and under the circumstances shown, being "immediately preparatory to," accompanying and in the progress of the act in question, were admissible, as a part of the *res gestae*, to explain and as tending to show the character, intention, and purpose of the trip.

We think the evidence, and the reasonable inferences therefrom, most favorable to claimants, as to Edwards' general and broad duties and authority in furthering and promoting the business and interests of his employer as heretofore stated and the discretion allowed him as to time, manner and means of doing so, his aforementioned declarations and acts in reference to the trip in question, and the other facts and circumstances conducing to show the character and purpose of his trip, constituted sufficient and substantial evidence tending to show that his death resulted from an "accident arising out of and in the course of his employment." [Sec. 3301, R. S. 1929.] We have noted that the conflict in the evidence bearing upon certain defensive matter made an issue of fact for the trier of fact. An award of the Compensation Commission "has the force and effect of the verdict of a jury" and if supported by competent and substantial evidence it is conclusive of all questions of fact. [Decker v. Raymond Concrete Pile Co., 336 Mo. 1116, 82 S. W. (2d) 267; Phillips v. Air Reduction Sales Co., 337 Mo. 587, 85 S. W. (2d) 551.]

■ Edwards had not been "in the employment" of the Ethyl Corporation "for the full year immediately preceding the accident" and Section 3320 (c), Revised Statutes 1929, provides that in such case "the compensation shall be computed according to the annual earnings which persons of the same class in the same employment and same location . . . have earned during such period." The company's policy was to start a field representative at $150 a month but the minimum salary of regular field representatives was $175 per month and such new employee was advanced to that salary when his experience was such that he had become familiar with the work. Edwards had been so advanced on July 1 preceding his death. At the time of Edwards' death other field representatives (of the same class, in the same employment, etc.) had been and were regularly paid a minimum of $175 a month. The Compensation Commission applying paragraph (c) of Section 3320, supra, computed compensation on the basis of $175 a month. [Casebolt v. International Life Ins. Co. (Mo. App.), 42 S. W. (2d) 939.] Apparently appellants contend that the Compensation Commission should not have applied the foregoing provisions of paragraph (c) in computing compensation. The section in its several divisions fixes rules and methods for computing compensation. We find no exception allowing for the fact that Edwards' death occurred but a short time before the expiration of a full year or any statutory provision for computing the compensation differently in such case, therefore the computation would seem properly to come within the provisions of paragraph (c), supra, which the commission followed.

It follows that the judgment of the circuit court should be affirmed. It is so ordered. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.