CURTIS R. MORROW, APPELLANT, v. ORSCHELN BROTHERS TRUCK LINES, INC., AND HARTFORD ACCIDENT AND INDEMNITY COMPANY, RESPONDENTS.—151 S. W. (2d) 138.

Kansas City Court of Appeals. April 7, 1941.

*Atwood & Atwood* and *Jay J. James* for employee-appellant.

1170

*Moser, Marsalek & Dearing* and *Lawrence Holman* for respondents.

BLAND, J.—This is an appeal from the judgment of the circuit court reversing an award of the Workmen's Compensation Commission. The award was in favor of Curtis R. Morrow, claimant, employee, against the defendant, Orscheln Bros. Truck Lines, Inc., employer, and the Hartford Accident and Indemnity Company, the insurance carrier. It was for an injury to claimant's right eye, resulting in industrial blindness in that member.

The facts show that claimant, at the time of his injury was, and is now, employed by the Orscheln Bros. Truck Lines, Inc., as general freight agent. His duties consist of compiling tariffs, quoting rates, office supervision, solicitation of new business, handling of injury and damage claims, securing licenses for trucks, maintaining good will and the reporting of injuries, sustained by the employees, to the insurance companies. He also refers injured employees to doctors for proper medical attention. W. C. Orscheln, president of the Truck Lines Company, also selects doctors to treat injured employees. Claimant has no special hours of work. He is subject to call at any time. His salary is $3600 per year. In addition, he is furnished with an automobile to be used in connection with defendant's business. He also used the car for purposes personal to himself.

Claimant testified that he left his home in Moberly, where the offices of his employer are located, on the morning of September 20, 1938, on foot, to go to the office; that he made several stops on the way, in connection with his employment, "checking merchandise, I do that daily; that he also went to a book store to purchase some paper on which to prepare some rate schedules; that the store was not open so he made a solicitation call at another store; that he left there and started to the office of his employer; that he stepped into the street to await the passing of an automobile; that he then continued on across the street and when he was about in the middle thereof "it seemed like the wind was blowing my eye and it was irritable;" that he was first conscious of the trouble with his eye "right in the middle of the street;" that it was a sudden occurrence. "The car was gone and I started across the street, and just like any other thing blowing in your eye, I have had lots of things blow in my eye. Q. Blow in your eye? A. Well, I say blow, there was something in it. Q. Describe the sensation. A. Well, just something in my eye burned and I walked on to the office and wiped my eye out, but just whether it was flying sand or something in my eye—at the time I walked back to Dr. McGee and he said there was nothing in my eye." Referee Lynch: "But you say it burned? A. Yes, sir; just like it has happened twenty times since, something in my eye—in shaving, talcum powder go in your eye. It felt like sand, just under my lid,

felt like sand, that is all, burned;" that he told Mr. Orscheln what had happened and said that he would go to see Dr. McGee; that nothing was said to Orscheln about medical aid; that Dr. McGee found nothing in the eye, but he washed it out and put some medicine in it; that the doctor gave him some salve and told him the eye would be all right; that he then returned to work for Orscheln Bros.; that the doctor did not make any charge for his services in this instance.

Claimant's eye continued to burn and he called up Dr. McGee's office, on a subsequent occasion, but the doctor was not in. So he consulted Dr. Huber, his family physician, who also did some work for the employer. Dr. Huber gave claimant some argyrol for his eyes. This medicine helped his eye and claimant continued to use it but the soreness remained. By October 31, 1938, his eye had become in such a condition that he could not prepare tariffs without the aid of a stenographer. On that day he was in St. Louis, in connection with some work for his employer, and an acquaintance recommended that he see Dr. Tooker, an eye specialist, located in that city. He consulted Dr. Tooker that day and when he returned to Moberly on November 2nd or 3rd, he notified Mr. Orscheln that he had called on Dr. Tooker. Orscheln said nothing indicating his approval or disapproval of the act of claimant in seeing this doctor. Thereafter, Dr. Tooker continued to treat claimant at intervals until a few days before the filing, on October 28, 1939, of the claim with the Compensation Commission and thereafter until a few days before the hearing before the referee. The last treatment was received on December 14, 1939. These treatments were scheduled as nearly as possible so as to coincide with claimant's business trips to St. Louis for his employer so that he could make the trips "count double."

Claimant was able to see well with the eye before September 20, 1939, but at the time of the hearing his visions was such that the things he saw were "greasy looking." The appearance of the eye changed and a portion of the laches turned white about six months previous to the time of the hearing. The eye was somewhat puffed and it seemed that it did not open as wide as the left one. The claim for compensation was not filed until October 28, 1939, more than thirteen months after the accident.

Claimant testified that he paid all of the medical expenses that had accrued up to the date of the hearing; (this included the bill of Dr. Tooker; that of another doctor called in consultation by Dr. Tooker and a hospital bill); that his employer, through Mr. Orscheln, reimbursed him several days after his claim was filed for all but $20 of the amount expended, the amount refunded being $278.45; that he did not receive cash but was given a bookkeeping credit for the amount; that Mr. Oscheln told him that the balance would be taken care of. Claimant had discussed such reimbursements with Orscheln several times before this and before the filing of his claim. However,

he did not say anything about medical aid to Mr. Orscheln until after his expenses began to be a burden to him. Asked, on cross-examination, who bore the expense of his medical attention, he answered, "I did. . . . Some of that has been refunded." (This has reference to the refund of the said sum of $278.45.) "He didn't give me that in cash, he gave that to me on my books, because whenever I needed money I borrowed it from him and he just credited me that." About the time the claim was filed claimant wrote Orscheln a note listing the various doctor bills and stating: "I have other expenses that are not pressing and will get them to you later." Dr. Tooker charged on his books to claimant the cost of his treatments and did not charge them to the employer or the insurance carrier. Mr. Orscheln did not testify.

The answer filed to the claim for compensation pleaded that the claim was not filed with the Commission within the time prescribed by the statute, denied that the employee sustained an accidental injury arising out of and in the course of his employment and alleged that the Commission was without jurisdiction for the reason that the earnings of the employee exceeded $3600 per year.

The referee made an award of $2160 compensation, $200 for disfigurement, $298.45 for medical aid, or a total of $2658.45, but gave credit to the employer in the sum of $278.45, which latter sum it has paid to claimant, and found that "the employee has been extended medical treatment by the employer since about October, 1938, up to about the time of the hearing in December, 1939."

On review the full commission made the same award, as to the amounts as the commissioner and, expressly, found that the claim for compensation was filed within the time required by law; that "Employee sustained an injury to his right eye while crossing the street in performance of his duties for employer" and "we further find employee's annual salary and earnings did not exceed $3600, and therefore the average weekly wage was over $30 and the compensation rate of $20 per week. We further find that employer had notice of the accident and that the claim herein was filed within the time prescribed by law. We further find that employer is liable for money expended by employee for necessary medical aid and treatment and that such amount is $298.45, with the sum of $278.45 already having been paid."

On appeal to the circuit court the latter reversed the award on the sole ground that the claim for compensation was not filed within the time allowed by law.

Section 3727, Revised Statutes 1939, provides that no proceeding for compensation shall be maintained unless the claim therefor be filed with the commission within six months after the injury or death or, in case payments have been made on account of the injury or death, within six months from the date of the last payment.

Claimant admits that his claim was not filed with the commission within six months after the receipt of his injury, but insists that his claim was filed within the time required by the statute for the reason that the treatments by the doctors were continued up to within six months of the time of the filing of the claim and that these treatments, under the facts, must be considered as having been furnished by the employer and, consequently, payments made on account of the injury.

Section 3701 (a), Revised Statutes 1939, provides that, in addition to all other compensation, the employee shall receive, and the employer shall provide, such medical, surgical and hospital treatment as may reasonably be required for the first ninety days after the injury or disability, not exceeding the sum of $750, and thereafter such additional similar treatment as the commission, by special order, may determine to be necessary. Medical aid is classified in the statute as compensation on account of the injury and is held that such aid rendered the employee by the employer constitutes such payment on account of the injury as having the effect of tolling the Statute of Limitations. It is also held that where the employer furnishes such medical aid, after the first ninety days following the injury, without the special order provided by section 3701 (a), the employer must be held to have waived the requirement of such an order by the commission. [McEneny v. S. S. Kresge Co., 333 Mo. 817; Blahut v. Liberty Creamery Co., 145 S. W. (2d) 506.]

The question as to whether the employer, in this insistence, furnished the medical aid received by the claimant is a hotly contested one. There is no question but that, under the evidence, claimant had authority to employ, on behalf of his employer, physicians to treat his eye. There is direct evidence to this effect. In addition to the evidence that we have already stated in this connection, claimant testified that Mr. Orscheln did not object to his seeing a doctor (Dr. McGee) about his eye, ''because that is my duty and he left that to me.''

The determination of the question as to whether the claim was filed within time depends upon whether the employer was liable for the payment of Dr. Tooker's services to claimant.

It is not seriously contended by the respondents that Dr. McGee was not employed by the employer but it is contended that the employment of Dr. Tooker by claimant was a private employment by claimant and not as employment by the company. In this connection respondents say there is no evidence that claimant hired Dr. Tooker on behalf of his employer. It is true, as contended by respondents, that claimant told Mr. Orscheln that he was being treated by Dr. Tooker, but did not, until long after the accident, suggest to Orscheln that the employer should reimburse him for the cost of his medical services, which he had paid; that he did not, in the ordinary way, report the accident to his employer or the insurer; that he did not

suggest that the insurer furnish him with an eye specialist or other doctor and did not have the cost of the treatments charged to his employer or its insurer. When asked by his counsel at the hearing as to who bore the expenses of his medical attention, he answered: "I did." Again, when his counsel asked "Who is paying the expense of the present treatment," he replied, "I am." When asked by counsel to explain how the expense was borne, he replied: "Well, Mr. Orscheln paid me some of my money back." He stated that Mr. Orscheln knew that he was spending "my money pretty freely on my medical and my expenses of going to St. Louis and back." It is also pointed out that Dr. Tooker testified: "I wasn't treating him (claimant) as an industrial case, he was a private patient." The doctor did not extend credit to respondents but extended it alone to claimant.

Respondents point out that it was many months after the accident, when claimant's expenses became burdensome, that he spoke to Mr. Orscheln about being reimbursed; that the bookkeeping transaction in the form of redit was consummated more than six months after the receipt of the injury and, in any event, the action was prematurely instituted, as the credit was extended after the claim was filed and a suit may not be brought before a cause of action has accrued.

There is much in the record from which the commission would have been justified in finding that Dr. Tooker was employed by the claimant, privately, with no intention of having his employer pay for the services. Yet, we think also that there is enough in the record to justify the finding, in effect, by the commission to the contrary. The evidence well-nigh conclusively shows that had Dr. Tooker's bill not been paid, and the doctor had sued the employer for it, he could have maintained the action only on the ground that it was an undisclosed principal. There is nothing in the record to indicate that the claimant told the doctor that he was employing him on behalf of claimant's employer and the doctor did not make a charge against any one except the claimant.

However, regardless of what the arrangement was between claimant and the doctor about the payment of his bill, there is nothing, necessarily, inconsistent about what the claimant did in reference to the doctor's employment and the thought that, as between himself and his employer, he was employing the doctor on behalf of the latter as an undisclosed principal, and we think there is evidence from which the commission could have found that this was the situation. The claimant testified that even before his claim was filed he took up with Mr. Orscheln the matter of reimbursing him for the money he had paid Dr. Tooker and the evidence is without dispute that the employer did reimburse him for practically all of his outlay in this respect and agreed to take care of the rest. While this was done by the employer after the filing of the claim, it tended to show that claimant intended to employ Dr. Tooker on behalf of the truck lines

from the very beginning and that the latter so understood. We are not to be construed as holding that anything that was done by the employer, after the Statute of Limitations had expired, could revive the claim or that the claimant could file a claim and thereafter perfect it when it theretofore did not exist or became barred. The circumstances of the employer recognizing that it was liable to Dr. Tooker by giving credit on its books to claimant for reimbursement for what he had paid to the doctor was, in effect, an admission of its liability and there is no contention that the admission of a defendant's liability, even after suit is brought, is not competent evidence to show, if it does so show, that defendant or claimant had a valid and subsisting cause of action at the time the claim or suit was filed. We place no conclusive meaning upon the testimony of claimant that he bore the expense of the medical attention and that he was paying the present expenses of the treatment and the doctor bills were his and that he was spending his money. Claimant is not conclusively presumed to have been using this language in any technical sense. When he paid Dr. Tooker, he no doubt recognized, as it was his duty to do, in view of the fact that he had not disclosed his principal, that he owed the doctor and that the bills were his as between him and the doctor. Respondents comment upon the finding of the commission "that the employer is liable for money expended by the employee for necessary medical attention and treatment," etc., saying that this finding is opposed to claimant's contention that the employer furnished medical treatment. The commission expressly found that the claim for compensation was filed within the time required by law and we place no importance on the finding referred to by respondents except that, in general, it was an explicit one that the employer was liable for the bills. If it was legally liable to pay them, the fact that it had or did not pay the entire amount would be of no consequence so far as concerns the question of their being made on account of the injury, within the meaning of the statute. [McEneny v. S. S. Kresge Co., *supra.*]

There was no duty on the part of the employer, under the statute, to furnish medical aid after the expiration of ninety days and this finding of the commission could not very well have been one based on the ground that the employer breached its obligation by not furnishing the employee with medical aid and treatment before the expiration of that time. This is made apparent because the allowance covered expenses accruing, in a large part, after the expiration of ninety days after the accident. Any expenses that the employer was liable for after the expiration of ninety days would be those that it had authorized or recognized as its obligation to furnish. Under the circumstances, we think there was sufficient evidence upon which the commission could find that the claim was filed within the time required by the statute.

Respondents insist, however, that the action of the circuit court in setting aside the award must be affirmed on the ground that the accident, which claimant received to his eye, was not a compensable one for the reason that if one or more particles of dust or sand were blown into claimant's eye by the wind, and such caused the condition of his eye, such accident would not entitle claimant to an award as that event was a hazard unconnected with his employment because one common to the public generally.

There is no contention but that the accident which the claimant suffered arose out of his employment but the validity of respondents' contention depends upon whether or not it was suffered in the course of his employment. Of course, in order for claimant to recover, both conditions must be present. [Section 3691, R. S. 1939.] It was not the intention of the Legislature to make the employer an insurer against all accidental injuries which might happen to an employee while in the course of the employment but, only such injuries arising from or growing out of risks peculiar to the nature of the work in the scope of the workman's employment or incidental to such employment, and accidents in which it is possible to trace the injury to some risk or hazard to which the employee is exposed in a special degree by reason of such employment; risks to which all persons similarly situated are equally exposed and not traceable in some special degree to the peculiar employment are excluded. [Mueller Constr. Co. v. Industrial Board of Ill., 118 N. E. 1028.]

All of the courts recognize this rule but, in applying it to a given, or even a similar, state of facts, have not always arrived at the same result. However, it has been held that where one is on the street and a particle of dust is blown into his eye, resulting in injury, the accident does not arise out of his employment, although, the employee may at the time have been in the course of his employment. [See The Great Am. Ins. Co. v. Indus. Com., 366 Ill. 241.] In Bloomquist v. Johnson Grocery Co., 249 N. W. 44, it was held that an eye infection caused by a bug or beetle flying into an employee's eye, while he was employed in his work in the employer's store, did not constitute an accident arising out of the employment, there being no evidence that the presence of the bug was due to any condition connected with the place of work. We have been cited to no case where there was room for an inference that the dust or grit blown into the eye of the employee was stirred up by the wheels of a passing automobile, such as claimant insists to be the fact in this case. Accidents caused to pedestrian employees, who are required to use the streets in their work, by street cars and automobiles, have generally been recognized as accidents arising out of the employment. See Beem v. H. D. Lee Merc. Co., 85 S. W. (2d) 441, 443, where the Supreme Court of this State quoted approvingly from an Indiana case, as follows: "It is a well-established rule of law in compensation that, where an employee

in the performance of his duties as a traveling salesman is required to use the streets of a city (or public roads of the country), such streets become his place of work, and the hazard incidental to travel thereon, including the danger of coming in contact with moving street cars, is a danger incident to his employment.'' The cases are not all in harmony as to whether street accidents are compensable under a given state of facts. Many of them hold that the relationship only exists in such cases where the duties of the employee are such that he is obliged to be continuously upon the streets, or at least, spend a considerable portion of this time there. The theory being that the very nature of the employment subjects him to street dangers more than persons are generally subjected, which dangers must be considered as arising out of the employment. In such cases it is held that the accident is a compensable one and this seems to conform to the decisions in this State.

It appears that one of claimant's duties was to solicit customers in the city of Moberly for his employer and to check merchandise and that he had been checking merchandise in the same manner as he had been doing daily and had just called upon a customer soliciting business before he was injured. This naturally would require him to use the streets of that city and, while an automobile did not strike him, we think that if it stirred up the dust or grit, which was carried into his eye by the wind, the circumstances cannot be distinguished from a collision case. Had the wheels of the automobile come in contact with a stick or a piece of iron and thrown it against claimant, the accident could not have been said to have been materially different than had the car actually struck him, and the throwing by the car of the dust or grit into the air, if it did, which was carried into claimant's eye by the wind, constitutes an accident which must be placed in the same category. We have examined the case of Stone v. Blackmere & Post Pipe Co., 27 S. W. (2d) 459, cited by the respondents, and find it is not in point. However, under the authority of The Great Am. Ins. Co. v. Indus. Com., *supra*, and Bloomquist v. Johnson Grocery Co., *supra*, we hold that it was incumbent upon claimant to prove that the automobile actually stirred up the dust or grit. It is well known that dust or grit may be carried from most any source by the stirring of the atmosphere and, as the record now stands, it is left to speculation and surmise as to from what source the dust or grit came in this instance. However, as there is sufficient in the record to show that the facts in this connection may not have been fully developed at the trial before the referee, and in view of the fact that claimant may be able to show that the dust or grit was stirred up by the passing automobile, the cause should be remanded to the commission for a new hearing. It is insisted by the respondents that claimant's salary, paid by the employer, exceeded the sum of $3600 and, therefore, he was not an employee within the meaning of the

Workmen's Compensation law, providing that the word "employee" shall not include persons whose annual earnings exceed $3600. [See Section 3695, R. S. 1939.]

In this connection it is pointed out by respondents that the earnings mentioned in the statute are not referred to as cash earnings (see Section 3710, R. S. 1939) and that the term "earnings" is comprehensive enough to include anything of value received by the employee for his services. In this connection respondents refer to the testimony of the employee in which he stated that the automobile, which was furnished him by the employer to use in its business, was kept in the garage at the employee's home; that he was permitted to use it for personal, as well as business, purposes, and that all expenses in connection with its upkeep were paid by the employer. It is claimed that the personal use of the vehicle by claimant represented a real and definite value to him and, if it was worth anything, his earnings exceeded $3600 per year for the reason that he received that amount in cash in addition to the use of the automobile.

The commission found that claimant's annual salary did not exceed the sum of $3600. Claimant testified that his salary was $3600 per year, but on cross-examination he said that he was furnished the automobile not only in connection with the business, but that he was permitted to use it for his own convenience. There is nothing in the evidence to show that the employer could not have withdrawn that use at any time it saw fit, and that its use was anything more than a gratuity extended by the employer to the employee, which could have been terminated at any time. If it was such it could not be considered as any part of his compensation. [See Russell v. Ely & Walker Dry Goods Co., 332 Mo. 645.] No doubt at another hearing the facts in connection with this matter will be more fully developed.

However, it is contended by respondents that the record is barren of any substantial medical testimony tending to show that the condition of claimant's eye was caused by a foreign body entering it. Dr. Tooker testified that, when claimant first called upon him, he found superficial abrasions on the surface of claimant's right eye; "areas of deposits on the epithelium;" that "He didn't have the infiltration into the deeper layers of the cornea resulting in the keratities, disciform keratitis;" that the eye grew worse and about the middle of December, 1938, he diagnosed the condition of the eye as a "disciform keratitis;" that this character of keratitis is called "disciform" because of its shape or appearance on or in the eye; that disciform keratitis is an inflammation of the cornea of the eye; that there are quite a number of causes for this condition, some of them definite and others indefinite. In some cases the inciting cause is an injury to the epithelial covering of the cornea, admitting virus or poison into the cornea, inducing the keratitis or intensifying the condition; that some cases are caused by blisters on the cornea of an undetermined

origin; that some are caused by smallpox, by vaddinia; that "there are many alleged causes that have been difficult to prove and there are many cases which we can't be sure of the cause. Q. Now, these things you have just related are diseases, aren't they? A. Yes. Q. Did you find any of those existing in this patient? A. No. Q. Then what conclusion did you reach if any with reference to the cause? A. I reached the conclusion that the inflammation of the eye was incited by an abrasion of the epithelial lining of the cornea, admitting the entrance of the virus or toxic agent into the corneal substance;" that the virus came from without "because of the fact that I am able to find no other cause for the trouble. . . . In the first place, there was evidence of a disturbance of the corneal epithelium, and also because of the fact that investigations had · found no other reason for the trouble. . . . I found abrasions or areas of deposits on the epithelium, that is the covering of the cornea; that could have come from injury. I can't say that it did, of course;" that patients in cases of burning sensations usually have a foreign body imbedded on the cornea; that frequently foreign bodies are not found in the eyes because sometimes they are brushed off or washed off by the tears and by the time the patient gets to the doctor's office no foreign particle is discovered. He further testified that the vision in claimant's right eye was 5/200 and that such loss of vision is considered industrial blindness.

The doctor was afterwards asked a hypothetical question which assumed that the claimant, while walking across the street, suddenly felt a burning sensation in his eye; that his eye continued to bother him and he was treated by a doctor and in a month or a little more thereafter he came to the witness for treatment and the witness found evidence of abrasions on the eye. The doctor was then asked whether, in his opinion, "*could* that have been caused by a foreign body received at the time he was crossing the street? (Italics ours.) The doctor answered: "In my opinion it *could* have been caused by a foreign body;" (italics ours) that from the examination he had made of the eye, he concluded that the keratitis probably resulted from the injury. "I can't state to you that it did. Q. Well— A. I am basing my opinion on the fact no other cause was found, and that is the probable cause. Q. That is what I want— A. I can't state to you that it is the cause."

On cross-examination he was asked: "Now, Doctor, I believe I understood you to say that you cannot say this little incident he refers to about September 20, 1938, was the cause of the condition you later found, you won't say positively that it did, will you? A. I think I have said that that could be a cause of virus or disease entering the cornea and causing a disciform keratitis. I don't think I have ever said it was the only cause."

On behalf of respondents, Dr. Roy Mason, who examined claimant for the purpose of testifying, stated that claimant was suffering from disciform keratitis; that such condition may be due to herpes, or disease such as tuberculosis and syphilis; that he found a decided loss of sensitivity of the cornea of claimant's right eye; that this definitely indicated a disease to the tropic nerve; that this disease could not come from an infection received from a foreign body; that he was of the opinion that claimant's disciform keratitis was due to a diseased nerve condition of his right eye; that "We are rather well aware that some of them are due to some specific causes. Others are more vague and the cause is not definitely known, of which disciform is one. You can get at least a dozen different causes of disciform keratitis;" that the condition may be due to an injury, due to fever blister, etc.; that if the cause of the condition which the doctor found in this case were eliminated he would agree that the condition of claimant's eye resulted from an injury, but in view of the fact that claimant had a diseased condition of the trophic nerve, he was of the opinion that that was the cause of the keratitis.

Dr. Tooker was recalled and testified that the sensitivity of the cornea is lowered in all forms of keratitis, whatever the cause.

It is quite apparent from all of the medical testimony that it is difficult for a physician to determine the cause of disciform keratitis in any ordinary case. Nevertheless, we think the testimony was sufficient for the consideration of the commission as to whether the condition of claimant's eye was caused by dust or grit blowing into it at the time he was crossing the street in question. The evidence shows that the eye was in good condition prior to this time and, immediately upon crossing the street, claimant felt a burning sensation and the eye was irritated. The same day he consulted a doctor and continued to consult doctors. The condition of the eye grew worse and he then employed Dr. Tooker, who testified more than that the keratitis could have been caused by a foreign substance getting into the eye. He did more than merely state his opinion. He said it probably did and gave his reasons. He stated there was nothing else in the case that could have been the cause.

Respondents' theory was that the condition of the eye was due to a diseased nerve condition. Dr. Mason's testimony as to this was based upon the fact that there was loss of sensitivity in the eye. Dr. Tooker, on being recalled, testified that the sensitivity of the cornea is lowered in all cases of disciform keratitis, whatever the cause.

In support of their contention that there was no substantial evidence that the condition of the eye was due to the alleged accident, respondents cite Kimmie v. Terminal R. R. Ass'n, 334 Mo. 596, 604; Berry v. Kansas City Public Service Company, 341 Mo. 658; Hunt v. Armour & Company, 136 S. W. (2d) 312. These cases merely hold that a physician's opinion that a certain occurrence or condition

might, could or would produce a certain result is no more than an assurance that such a result was scientifically possible and that, under such testimony, whether such occurrence or condition did cause the result, where the evidence does not exclude all other causes, no layman could know or have any reasonable basis for an inference regarding the cause. As before stated, the evidence shows that claimant did not suffer from irritation in his eye prior to the accident that he received and thereafter the condition of the eye grew steadily worse, developing into keratitis. Dr. Tooker testified that he found nothing to explain the condition of claimant's eye except abrasions caused from a foreign substance or substances getting into his eye, which foreign substance or substances probably caused the condition under all of the circumstances. The fact that he did not state that it actually did cause it does not deprive all of the testimony upon this subject of the character of unsubstantial evidence. [Kimmie v. Terminal R. R. Association of St. Louis, 66 S. W. (2d) 561, 565; Kuhn v. City of St. Joseph, 234 S. W. 353; Reese v. Loose-Wiles Biscuit Co., 224 S. W. 63; Elihinger et al. v. Wolf House Furnishing Co., 83 S. W. (2d) 11.]

The judgment is reversed and the cause remanded with directions to the trial court to reverse the award of the commission and remand the cause to it for further action. All concur.