MARJORIE SMITH, by her next friend, HELEN SMITH, v. ABRAHAM FINE and NATIONAL CLOTHING & FURNITURE COMPANY, a Corporation, Appellants.—Nos. 38589 and 38590.—175 S. W. (2d) 761.

Division Two, December 6, 1943.

*Wilbur C. Schwartz* and *Victor Packman* for National Clothing & Furniture Company, appellant; *Orville Richardson* of counsel.

*Wilbur C. Schwartz* for Abraham Fine, appellant; *Orville Richardson* of counsel.

1184.

*Clark M. Clifford* and *Lashly, Lashly, Miller & Clifford* for respondent.

1186

BOHLING, C.—Plaintiff recovered $10.000 for personal injuries suffered when struck by an automobile. Defendants appeal. They present issues with respect to the (a) sufficiency of plaintiff's evidence to make a submissible issue (1) of defendant Fine's ability to stop his automobile under the humanitarian doctrine; (2) of the applicability of the doctrine of respondeat superior between defendant Fine and defendant National Clothing and Furniture Company, a corporation; (b) the admission of certain evidence, and (c) the giving of plaintiff's main instruction.

The accident occurred about 8:20 A. M. May 16, 1941. Plaintiff, Marjorie Smith, about 15 years of age, was struck by defendant Fine's automobile while on her way to Blewett high school in St. Louis as she was crossing Delmar avenue from the south to the north between Belt and Union avenues, a long block. Delmar is an east and west street. Union avenue intersects Delmar and Belt avenue extends north from Delmar. It is 79 feet between curbs on Delmar and street car double tracks are in the center of the street. There are two street car safety zones (a north safety zone for westbound and a south safety zone for eastbound street railway traffic) at the point involved, each zone approximating 90 feet in total length. They are not directly opposite each other. A short distance of the west end of the north zone is opposite a short distance of the east end of the south zone. The evidence established it was 22 feet 10 inches from the south curb of Delmar to the south safety zone; that the safety zone was 5 feet 9 inches wide; that it was 1 foot 1 inch from the safety zone to the

south rail; that it was 5 feet 4 inches between rails of the south street car track, and 4 feet 11 inches between the north rail of the eastbound and the south rail of the westbound street car tracks. The distances on the north side of Delmar between similar points correspond. The safety zone platform surfaces were 6 inches above the surface of Delmar.

The traffic was heavy when plaintiff reached the south curb of Delmar. She, after waiting, proceeded north and stepped upon the south safety zone within a few feet of its east end. Crossing the south safety zone, she looked west and observed several cars, the nearest being about 130 to 140 feet west and approaching along the eastbound or south car tracks. She stepped off the safety zone, onto the street, and, proceeding due north, took four or five steps, traveling 10 to 12 feet, when she was struck by Fine's automobile as she reached the south rail of the westbound or north car tracks. Defendant Fine was operating his automobile at a speed of between 15 and 20 miles an hour. He could stop in 20 to 25 feet. He sounded no warning of his approach. After stepping off of the safety zone, plaintiff observed the westbound traffic approaching along the westbound car track and did not again see Fine's approaching automobile. She was walking at an ordinary gait, neither loitering nor running. Plaintiff's mother testified that Fine informed her he did not know how the accident happened; he did not see plaintiff. This was denied by Fine.

Defendant Fine testified, among other things: He saw plaintiff standing on the safety zone when about 100 feet west of her. When he was about 4 or 5 feet from plaintiff, she "made a dash" in front of his automobile to cross the street. He tried to turn to the left to avoid plaintiff. Before he could sound the horn or stop, the right front headlight struck her when she reached, as we understand, the north rail of the east track. He stopped within 25 or 30 feet.

 Defendants contend plaintiff made no submissible issue of Fine's negligence under a humanitarian duty to stop, the only issue submitted. The argument is that since, under plaintiff's evidence, defendant Fine was proceeding along the eastbound track and plaintiff was struck at the south rail of the westbound (north) track, more than 11 feet north of the south safety zone, and the automobile could have proceeded east between plaintiff and the south safety zone without striking plaintiff, plaintiff was in a position of imminent peril only after the automobile was turned from the eastbound track toward the north (wrong) side of the street and there was no evidence establishing where and when this occurred and, consequently, none under plaintiff's theory that the automobile thereafter could have been stopped in time. Defendants cite many cases. Humanitarian issues pivot on a defendant's ability or inability to avoid the injury subsequent to the creation of the injured's imminent peril,

necessitating, from their very nature, the consideration of the specific constitutive facts of the individual case. Therefore, cases going off, for one reason or another, on a failure to establish a specified constitutive element (illustrative: Swain v. Anders, 235 Mo. App. 125, 133, 140 S. W. 2d 730, 736[9]) of a humanitarian case, or evidence inconsistent with physical facts (Bauer v. Wood (Mo. App.), 154 S. W. 2d 356, 359[10, 11]), or wherein a defendant's inability to avoid the injury on account of his automobile "skidding" coincidentally with the creation of plaintiff's imminent peril (Ridge v. Jones, 335 Mo. 219, 224(I), 71 S. W. 2d 713, 714[1, 2]); or wherein the plaintiff places himself in imminent peril in such circumstances as not to afford defendant due opportunity to avoid the injury (Wells v. Raber, 350 Mo. 586, 166 S. W. 2d 1073), are to be distinguished from the instant case. Statements are to be found therein, and properly so in appropriate instances, that the injured's imminent peril did not arise until the turning of the automobile. We need not discuss all these situations. Cases wherein a defendant's act first discloses the ensuing imminent peril are more in point. Phillips v. Henson, 326 Mo. 282, 30 S. W. 2d 1065, 1067[5], states: "Plaintiff was not in peril until the truck turned to the left." We agree under the facts involved. There, the accident occurred at the intersection of Easton (a 50 foot east and west street) and Kienlen (a 30 foot north and south street) avenues. Street railway double tracks occupied the center of Easton. Plaintiff, a motorcyclist, was traveling west, north of the tracks, and defendant, a motorist, was proceeding east along the south track on Easton. When the motorcyclist reached the east curb line of Kienlen, the motorist was 25 feet west of the west curb line of Kienlen and suddenly, without warning, turned left to proceed north on Kienlen at a speed permitting of a stop within 3 to 4 feet and an actual stop within 2 to 3 feet. The left end of the bumper struck the rear wheel of the motorcycle at a point 3 to 5 feet east of the west curb of Kienlen and 3 to 4 feet north of the north line of Easton. (326 Mo. l. c. 286, 30 S. W. 2d l. c. 1066.) The distance involved subsequent to the motorist's turn was several times the "3 to 4" feet required for a stop and the court's discussion of the applicability of the humanitarian doctrine included a portion only of the distance between the point of the turn and the collision (326 Mo. l. c. 290, 30 S. W. 2d l. c. 1067[7]). The observation in Phillips v. Henson, supra, appears to be taken in a number of subsequent cases as the ultimate limit of the imminent peril zone in instances involving a turning by the instrumentality inflicting the injury. Such interpretation applied to other facts might restrict unduly the imminent peril zone.

The instant plaintiff was struck while at the south rail of the north track. Her testimony that she proceeded north at an ordinary walk and defendant Fine's testimony that plaintiff "made a dash"

to cross in front of his automobile presented a conflict for the jury. The automobile had to turn to the north at some point subsequent to plaintiff's last view of it to strike plaintiff while at the south rail of the north track. Fine admittedly saw plaintiff when about 100 feet distant. Plaintiff would have been in the observable and ascertainable path of Fine's automobile from the time she stepped off the safety zone had she been struck while upon the south track. Taking plaintiff's view of the evidence, the fact that Fine intentionally turned his automobile, changing its direction and its path, did not cause the path of the automobile to differ from the direction Fine intended it to take. Plaintiff was not chargeable with notice of Fine's intention—no more so than a defendant is chargeable with sudden unto-be anticipated action of a plaintiff creating [764] imminent peril. Fine, as is a plaintiff in appropriate instances, was chargeable with knowledge of his intended change of the path of his automobile. Fine alone knew of his intention to turn. In these circumstances plaintiff was in the path known to Fine of the oncoming automobile while at the south rail of the north street car track as much as she would have been in its observable path to others while on the south track had no turn occurred. It was Fine's duty to stop his automobile when it was 25 to 30 feet or more distant, whether prior or subsequent to the turn, along its path from plaintiff to avoid injuring plaintiff. The fact that an automobile operator intentionally proceeds on a curve known to himself should not on this issue distinguish the case from one where an automobile operator proceeds along a straight path known to himself and observable to others. The subjective fact of an intention and knowledge of a turn prior to turning results in the ensuing path of the automobile being a continuation of its intended path prior to the turning becoming visible as much as the objective fact of the approach of an automobile causes the then apparently visible path of the automobile to remain its intended path when no turn actually occurs. This is not a case involving a turn suddenly necessitated by the act of some third person under the evidence favorable to plaintiff.

Allen v. Kessler (Mo.), 64 S. W. 2d 630, 632, sustains us. There plaintiff saw the approaching truck 130 feet away traveling between the curb and street car track and gave it no further attention. Plaintiff was next aware of the truck when it struck him while he was about midway between the rails of the street car tracks. The court held that, notwithstanding the record did not disclose where the truck operator changed its course, the record did show that its direction was changed at some point within the 130 feet, and the jury could find that there was a time and place when and where the truck operator should have taken the necessary steps to avoid the collision. This is sufficient to rule the instant issue. The court might have but did not base its holding on the testimony (l. c. 632) of a policeman that the

1192

truck was a-straddle the rail 25 feet or more distant from plaintiff and that it could have been stopped in 20 feet. Observations by the author of the early and often cited case of Phillips v. Henson, supra, on the issue in McCarthy v. Sheridan (Banc), 336 Mo. 1201, 1206, 83 S. W. 2d 907, 909, also sustain this result; vide: "It is true that plaintiff was not in actual peril till defendant swerved his car to the left out of the usual line of travel, but *the jury may well have believed* that *defendant* saw or *should have seen plaintiff* in her then position *before defendant actually swerved* the car to the left *and changed his line of travel* so as to inevitably strike plaintiff. Her position of imminent peril was created by his turning out of the regular line of travel to a new line of travel over the spot where plaintiff was moving or standing, and he could and should have observed this before or *at the time he determined to take the new route.*" [Italics ours.] Some of the quoted expressions may be contradictory. The thought, however, persists that the new path of an automobile is-its path for the purposes of the humanitarian doctrine when its operator freely and knowingly changes its apparent path. See McCombs v. Ellsberry, 337 Mo. 491, 499, 85 S. W. 2d 135, 138.

■ Defendant National Clothing and Furniture Company's liability rests upon the doctrine of respondeat superior, which it asserts was not a submissible issue under the evidence.

The automobile was owned and operated at his own expense by defendant Fine. Fine had been and was "working for" the National Company as collector and salesman for over two years. He was paid a weekly salary. He would report daily at the office at 9 A. M., would be given a number of cards, 60 or 70, with the names of persons thereon from whom to collect, would proceed in his automobile to see the persons named and note their payments on the proper card, and the next morning would report and account, returning the cards covering the previous day's work and receiving new cards for that day's work. This is the work for which he received his salary. There- were four other collectors, each of whom had an automobile and used it in making collections. He believed the National Company was under the impression he had an automobile when he applied for work. He,told them he had an automobile. The National Company told him to use it in making collections and following its instructions he has used an automobile for making collections throughout his connection with the Company. At the time of the accident, Fine was not proceeding in the direction of the National's office, [765] which was north and east of his home, but was proceeding west and south from his home. He was on his way to Newstead avenue to see a customer to make a collection for the National Company and then proceed to the National's office to report for the day and turn in the money. The accident prevented him carrying out his plans. After the acci-

dent, he telephoned the office, informed the bookkeeper what had happened, telling him to inform Mr. Klearman (the National Company was under the management of Julius Klearman and Nathan Klearman, father and son) that he would not be there at 9 A. M. Nathan Klearman came to the police station. Fine could quit the employ of National and National could discharge him at any time.

On cross-examination Fine testified: He maintained his automobile, purchased the gas, oil, license, et cetera and was not reimbursed therefor at times, on a slow day, he might ride the street car or bus. He was never given instructions that he had to show up at work with an automobile. He was not told who to see first; that is, in what sequence those named on the cards were to be seen, but: "Q. Did you lay out your own route? A. No, sir." He used the automobile for personal purposes; if his wife telephoned him, "and I have time," he would take her wherever she wanted to go. Asked if he ever stopped to drum up business, he replied: "That is part of my job"; and that he was free to see anyone to "stir up business." He was of opinion he had made collections on all cards delivered to him May 15th. He used his own judgment. If he did not make the collection one day, he made it the next. He knew "my stuff by heart." If he could save a little time and not have so much for the next day, "I can make that stop of my own free will." He said he was not supposed to account for money received every morning but was supposed to turn in a card with his collections; that any collection on a card would be turned in the next day but it might be two or three days before he turned it in if he made a collection for which he did not have a card, and on a heavy day he might "hold out" $10 or $20, reporting it later. The National Company would not know of the collection unless he had a card. He had no card that morning for the customer he was on the way to see. He was never told not to make a collection without a card. He thought May 16th would be a heavy day and if he could make this particular collection "I wouldn't have to work so hard that particular day." He testified he was only trying to accommodate himself and save on gasoline; that his time was his own "as long as I do my work, bring in the money and bring in the business."

A number of our cases quote and apply to like issues the definitions appearing in the Restatement of the Law of Agency, Sec. 2:

"(1) A master is a principal who employs another to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service.

"(2) A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master.

"(3) An independent contractor is a person who contracts with another to do something for him but who is not controlled by the

other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking.''

See also Sec. 220, ibid; Skidmore v. Haggard (1937), 341 Mo. 837, 110 S. W. 2d 726, 729; Mattan v. Hoover, 350 Mo. 506, 166 S. W. 2d 557, 564; and consult cases cited in Pfeifer v. United Bakers Supply Co. (Mo. App., 1942), 160 S. W. 2d 795, 800 et seq.

We think it was for the jury to say whether the relation of master and servant existed between the National Company and Fine. The National Company may not have exercised actual control over the physical conduct of Fine in the performance of his work. The National's Company's right to control (right to direct)—is an issue not to be slighted. It is the crucial question. Fine's time may have been his own as long as he did his work but National Company gave him 60 to 70 cards daily, and he was at the time (as shown hereinafter) about his work on a heavy day. He may have been trying to accommodate himself and save gasoline but it was also for the jury if likewise he could have saved on gasoline et cetera had he put off the trip until the next morning on his way to work. They might have considered that such postponement would have prevented his working ''so hard'' on the heavy day of May 16th. We understand he incurred no [766] liability if he failed to report. He could be discharged. He could quit. In other respects his employment was regular, continuous and on a weekly salary basis. He had been at the work for two years. He was not employed at an agreed compensation for a specific job. He was not paid a commission on collections effected. He reported daily to receive cards. His territory was limited. His acts were under supervision. It does not appear that the National Company's collectors or Fine were engaged in the distinct occupation or business of collecting accounts. Fine was not collecting for other companies. His work was not of such a nature as to require a specialist over whom the National Company would exercise no supervision or right of supervision. The work was part of the National Company's business, an ordinary, every day and essential incident thereof. The National Company did not furnish the automobile or pay for its operation but the jury may have considered it had been taken into consideration in the weekly salary. The National Company told him to use his automobile in making collections and following that direction he had used his car since his employment. '' 'It is not the fact of actual interference with control, but the right to interfere that marks the difference between an independent contractor and an agent or servant.' '' Riggs v. Higgins (Banc), 341 Mo. 1, 106 S. W. 2d 1, 3, quoting with approval Aubuchon v. Security Const. Co. (Mo. App.), 291 S. W. 187, 189. Corder v. Morgan Roofing Co., 350 Mo. 382, 166 S. W. 2d 455, 457; Mattan v. Hoover Co., 350 Mo. 506, 166 S. W. 2d 557, 564. Annotations, 140 A. L. R. 1150; 112 A. L. R. 920; 87 A. L. R. 787; 60 A. L. R. 1163; 57 A. L. R. 739. Consult Annotation,

116 A. L. R. 1389. The following observation from Vert v. Metropolitan Life Ins. Co., 342 Mo. 629, 117 S. W. 2d 252, 257, 116 A. L. R. 1381, is apropos here: "We hold . . . that when he went out of his debit for that purpose [his activity as a life insurance agent] he wholly departed from his regular employment in which the company had a right to direct his physical activity for its accomplishment . . ."

Whether Fine was at the time acting within the scope of his employment was also for the jury. Usually, a servant using an automobile, either his master's or his own, in going to and from his place of work is regarded as acting for his own purposes and not as engaged in work for his master. Pesot v. Yanda, 344 Mo. 338, 126 S. W. 2d 240, 244. The instant situation is the reverse of those existing in cases where an employee deviates from his duties and enters upon a personal mission. Here, if the doctrine of respondeat superior be considered not applicable while Fine was going to and from work, Fine at the time in question had deviated from his personal mission of going to his employer's office and had entered upon the performance of a duty owed his employer. Fine knew "my stuff by heart." He was never told not to make collections unless he had a card. He was at liberty to make stops of his own volition. Employees are not discouraged from being attentive, alert, and energetic in their employer's behalf. Any accommodation accruing to Fine for making the trip prior to reporting to work was incidental to the discharge of his duties as one of the National Company's collectors. Otherwise, no occasion existed for his making the trip. At least the jury could find that it was made on behalf of Fine's employer. Mattan v. Hoover Co., 350 Mo. 506, 166 S. W. 2d 557, 566[9]; Corder v. Morgan Roofing Co., 350 Mo. 382, 166 S. W. 2d 455, 458. Observations subject to being considered out of harmony herewith in Reiling v. Missouri Ins. Co., 236 Mo. App. 164, 174, 153 S. W. 2d 79, 85, are disapproved.

The admissibility of defendant Fine's testimony at the trial that at the time he was going to Newstead avenue to make a collection from a customer of defendant National Company is questioned by the National Company on the ground (a) admissions by an agent subsequent to the transaction are not binding on the principal and (b) were conclusions as to his intentions and without probative value.

Cases cited by the National Company holding extrajudicial post rem statements or admissions of an employee inadmissible against his employer are not in point. We are concerned with Fine's testimony in court, judicial, not extrajudicial, statements.

The National Company says Collins v. Leahy (Div. I, 1940), 347 Mo. 133, 146 S. W. 2d 609, is directly in point that Fine's intentions were inadmissible against it. Concerning a regularly employed chauffeur's testimony that he was headed toward a college "to get

Mr. Leahy's son. That is where I was going when the accident happened. . . . I was not permitted [767] to use the car for my own purposes. Mr. and Mrs. Leahy were out of town, but it was my duty to obey the nurse (in defendant's home) and she told me to go after the son'' (136 and 610, respectively); the court remarked in ruling: ''In some situations a conclusion may be considered (City of St. Louis v. McCully Const. Co. (Mo. App.), 184 S. W. 939, loc. cit. 942, and cases there cited), but we find no case where such conclusions as here have been considered of any probative value'' (138 and 611, respectively). An understanding of Collins v. Leahy does not sustain the assertion that the remarks are controlling or even in point here. The issue was whether Leahy's chauffeur was at the particular time and place on a mission for Leahy. The discussion makes clear that the accident occurred at a point where Leahy's chauffeur had no right to be and while traveling in a different direction to that which he would have been proceeding had he been going to where he testified he was going. In the absence of any explanation, and there was none, *such* testimony was contrary to the physical facts juristically involved in the issue and consequently lacked probative value to establish that the chauffeur was at the place in question on his stated mission for Leahy within the meaning of the law although he was, generally speaking, on his way. See former appeal, 344 Mo. 1. c. 265, 125 S. W. 2d 1. c. 882. The foregoing distinguishes the cases, although other distinctions may exist. A factual element of a decisive nature in an action for injuries against one not the operator of the automobile is the purpose for which the automobile was being used at the time of the occurrence. The observable facts are available when the operator continues and completes the mission. Where the operator was going and what he was about is as much the fact involved when the occurrence prevents the accomplishment of the mission as what he otherwise would have done. One's intent or motive in many instances is a factual issue. Extrajudicial statements thereof are admissible when part of res gestae. Edwards v. Ethyl Gasoline Corp., 342 Mo. 98, 106, 112 S. W. 2d 555, 560[3, 4], holding declarations made immediately preparatory to, accompanying and in the progress of the act in question admissible as part of the res gestae ''to explain and as tending to show the character, intention and purpose of the trip.'' Fine's testimony that he was ''going down on Newstead to make a collection'' et cetera was material and admissible. Vansickle v. Brown, 68 Mo. 627, 634[5]; State v. Lyle, 296 Mo. 427, 435(II), 246 S. W. 883, 885[2]; Branchini v. Florio, 119 Conn. 212, 175 Atl. 670, 672[4].

Plaintiff's mother, who acted in plaintiff's behalf, testified in detail, over objections and exceptions, to statements made by Fine sometime after the occurrence that, in effect, he wanted plaintiff to have what was necessary in the way of medical attention and that,

in effect, he pleaded to have her dismiss a charge against him of careless driving as he was going to take care of plaintiff.

We conclude plaintiff's contention that this testimony was admissible as an implied admission against interest of negligence and liability is not well taken on the record presented. There is language in Morrow v. Orscheln Bros. Truck Lines, Inc., 235 Mo. App. 1166, 1177, 151 S. W. 2d 138, 143[3], supporting plaintiff's contention that the evidence with respect to medical attention was admissible; but the court was there discussing evidence introduced before the Workmen's Compensation Commission and the instant contention was not presented or ruled. Brown v. Wood, 201 N. C. 309, 160 S. E. 281, 283[3], and Briggs v. John Yeon Co., 168 Ore. 239, 122 Pac. 2d 444, 450[9], differ factually. The admissibility of the statement with respect to medical attention against defendant Fine may be close but, in the circumstances, we consider the statement an offer of remedial assistance. State ex rel. S. S. Kresge Co. v. Shain, 340 Mo. 145, 154, 101 S. W. 2d 14, 19[7], states that an argument turning against a corporation the fact it had voluntarily furnished necessary medical, care and attention at considerable expense as an admission of negligence and liability was unfair and highly prejudicial. Winter v. Van Blarcom, 258 Mo. 418, 423[1], 167 S. W. 498, 499(I), held proper the striking of testimony that defendant stated he would do all in his power to help and would be responsible for all debts and not to worry, considering such testimony as an offer to pay for the treatment of an injured boy and not as an admission of liability. The testimony with respect to Fine's arrest was incompetent and should have been excluded. Hoffman v. Graber (Mo. App.), 153 S. W. 2d 817, 819[1]; Marrah v. J. & R. Motor Sup. Co. (Mo. App.), 165 S. W. 2d 271, 276[6].

But plaintiff says defendants may not avail themselves of the situation because the objections interposed were not sufficiently specific; that is, there was no objection on the ground the evidence was prejudicial. Span v. Jackson-Walker C. & M. Co., 322 Mo. 158, 178(VII), 16 S. W. 2d 190, 200[19], holds an objection that evidence is immaterial does not reach the contention upon appeal that such evidence was prejudicial, reasoning if not material it could not prejudice. Generally, objections should be sufficiently specific to inform opposing counsel and the court of the objectional feature that an opportunity, if any exist, be afforded for its removal. Rockenstein v. Rogers, 326 Mo. 468, 486, 31 S. W. 2d 792, 801[1]; Scott v. Missouri Pac. Rd. Co., 333 Mo. 374, 387[12], 62 S. W. 2d 834, 839[14]; State ex rel. Randall v. Shain, 341 Mo. 201, 211[3], 108 S. W. 2d 122, 128[4]. There is a modification of this rule in instances where the evidence is so clearly incompetent that there exists no objectional feature for removal to make it competent. See State v. Baldwin (Banc), 317 Mo. 759, 766(II), 297 S. W. 10, 12[3, 4]; Houchin v. Hobbs (Mo. App.), 34 S. W. 2d 167, 172[5]; Sexton v.

1198

Lockwood (Mo. App.), 207 S. W. 856, 857[1]; Kelly v. American Cent. Ins. Co., 192 Mo. App. 20, 22, 178 S. W. 282[1]. The objections interposed embraced the thoughts the evidence was "not competent for any issue"; was "not material to any issue" and was "not binding in any way." In the circumstances defendants are privileged to present the prejudicial issue of the testimony, although specifically including such thought would have been better practice. These post rem statements of defendant Fine were "not binding" on defendant National Company. The court understood the National Company's position from prior objections interposed.

Plaintiff's assertion that defendant National Company did not object to this evidence is refuted by the record which shows that counsel interposing the objection appeared on behalf of defendant National Company as well as defendant Fine.

The other issues presented can be so readily obviated at a retrial that we need not discuss them.

The judgment is reversed and the cause is remanded. *Westhues* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.