# Gayheart's Adm'r et al. v. Gayheart et al.

Oct. 10, 1941.

Craft & Stanfill and J. W. Jones for appellant.

John W. Caudill for appellee.

OPINION OF THE COURT BY SIMS, COMMISSIONER—Affirming.

Mrs. Jemima Gayheart died intestate on May 11, 1930, possessing practically no personal estate but was the owner of a 50 acre farm located in Knott County upon which she resided. A son, Earl, qualified as administrator and instituted this action against his father, brothers and sisters to settle the estate alleging that it was necessary to sell the land to pay the debts. The petition alleged the estate was indebted to him in the sum of $1,645.48 for money and supplies he had advanced to his mother at her special instance and request and for which she promised to pay him. It further alleged at her special instance and request he performed labor on her farm for five years and she promised to pay him a reasonable sum therefor, which is $1,500. The answer is a traverse, and upon Earl's motion the case was referred to the master commissioner to hear proof and report claims.

After hearing proof the commissioner filed his report allowing the $1,645.48 but refusing to allow any part of the $1,500 claim. The defendant's exceptions to this report were sustained by the chancellor who adjudged the $1,645.48 was not a proper claim against the estate, and held its only indebtedness was $221.60 for funeral expenses (which was not contested). He ordered the land sold to pay the funeral expenses and the action continued for further proceedings. Earl appeals.

The proof shows Mrs. Gayheart was a large, robust woman, industrious and frugal, and although illiterate, she was the real head of her household. Her husband, Tom, was a horse trader, rather of the cavalier type without much earning capacity, and as he spent most of his time away from home, the responsibility of rearing and supporting the family largely devolved upon his wife. There were seven children, three boys and four girls, and at times the family had a struggle to make ends meet. Burnam, the oldest boy, had charge of the farm until he married and established his own home. Then the next boy, Grover, assumed command until he

married in 1924 or 1925, and he was succeeded by Earl, who was 24 when he testified in 1931, so he must have been only about 17 years of age when he took charge of his mother's farm. During the time Earl had charge of the farm, the household consisted of himself, his mother, her husband, Tom (when Tom was home), a sister, Alpha, and another sister, Molly, and her two small children. About 1927 Alpha married Jim Cantrell who became a member of the household and an associate, if not a partner, of Earl in operating the farm and raising and dealing in livestock.

All the family, with the possible exception of Tom, possessed considerable industry and each lent a helping hand to the family support even after leaving the parental roof. Molly taught school for five years and used some of her salary for the benefit of her mother and the family. As a member of the household under Earl's regime, Molly testified she did the cooking and washing, and applied the meager proceeds from her own farm to the common welfare. After he left home, Burnam contributed the rent corn from his farm to his mother while Earl operated her farm. After laying his crop by in July, Earl worked in coal mines until March when he would return to the farm to pitch another crop. He thus worked for three or four years and his earnings in the mines were between $3 and $4 per day, a goodly portion of which went into the family till. Mrs. Gayheart at times took in washing and she received $75 per year rental from an oil lease on her farm. Thus we have some idea of how the family lived.

Earl's claim of $1,645.48 is made up of taxes he contends he paid for his mother from 1922 to 1930, and a great number of items of supplies he furnished the family such as food, clothing and coal, also, supplies for the farm such as fencing, feed for the livestock, lumber and repairs for buildings. There is considerable conflict in the evidence as to whether he furnished the money which paid the taxes or whether it came from the oil rental augmented by funds contributed by the other children. The proof shows Jim Cantrell and Earl raised and dealt in considerable livestock and at one time they sold between $300 and $400 worth of cattle to Burnam. No accounting was made of what they received from the farm. It is true most of the farm produce, or the proceeds therefrom, went to support the family but Molly

testified she hoed corn the same as Earl and Jim. By good management Earl not only made the farm contribute greatly to the support of the family, but he picked up tidy sums now and then for himself from livestock he kept on the place.

As we view the evidence there is no proof of an express contract made by Mrs. Gayheart to compensate Earl for what supplies he furnished the family or for any money or labor he expended on the farm. A fair sample of the testimony on this point is: "Did your mother promise to repay it to you? A. Yes, sir." Earl further testified that on her death bed his mother said, "She wanted me to have all she had." None of this testimony was objected to—indeed no written exceptions were filed to any of the testimony and the chancellor's ruling obtained thereon as is required by Sections 586-589, Civil Code of Practice, hence there is no question of the competency of the evidence before us. Chestnut v. Allen, 282 Ky. 703, 139 S. W. (2d) 729. Alpha testified relative to her mother's alleged contract with Earl: "She said at different times she wanted Earl to have pay for what he had spent on the place, then she said she wanted him to have the land at different times." Agnol Jones, a 15 year old grandson of Mrs. Gayheart, testified: "She always said she wanted Earl to have the land if she died before she was able to pay him back." This boy further testified his grandmother made such a statement the day she started to the hospital, which was just a day or so preceding her death.

Let us see if this testimony shows an express contract under the law on the part of Mrs. Gayheart to pay her son for the money advanced and services performed for her benefit. There are several well-established rules of long standing governing cases of this character: 1. Each case is largely controlled by its own facts. 2. Acknowledgment of the services and the expression of gratitude by the recipient, accompanied by only a desire that the one rendering them should be compensated, or an indefinite intention to compensate him in the future, is not sufficient to establish an express contract. 3. Where there is a close relationship between the parties and the plaintiff relies exclusively upon an express contract, such must be established by clear and convincing proof. 4. Where the relationship of the parties is such as to raise the presumption that they lived together

as a matter of mutual convenience, the law will not imply a promise to pay for ordinary personal services, or for extraordinary services rendered in an emergency or for a brief period; but where the services are of an extraordinary and menial character and extend over a long period, there is no presumption they were rendered gratuitously and the law will imply a contract to pay therefor. 5. To establish an express contract it is not necessary that the evidence show a categorical promise by the recipient to pay or by the performer to render the services for a consideration; it being sufficient to prove that the recipient expected to pay and that the performer expected to receive compensation. DeFever's Ex'r v. Brooks, 203 Ky. 606, 262 S. W. 976; Murphy's Ex'r v. Bryan, 230 Ky. 244, 18 S. W. (2d) 978; Kellum v. Browning's Adm'r, 231 Ky. 308, 21 S. W. (2d) 459. The Kellum case is very exhaustive, citing a vast number of authorities, many of which are collated, hence it is not necessary to do more than refer to it here.

The plaintiff relies solely upon an express contract but his evidence falls far short of proving one. Here the family were living together for their mutual benefit, each member doing his and her best to keep the wolf from the door, and Earl's services were not unusual for a male member of the family to perform. The mother did not expect to pay Earl, nor any of her other children, for his or their contributions to the up-keep of the family, and certainly he or they did not expect to be compensated. Any other conclusion would be unnatural and contrary to human experience. As Earl was maturing into manhood he had the advantages of a home and the love and care of a mother and two sisters, and in return he did a splendid part by them. It was, perhaps, due to his efforts more than those of any other member of the household that the family larder was never allowed to reach bottom. But the other two boys during the time they led the family expended their best efforts on behalf of it, to say nothing of Molly's valiant assistance all the while. None of them expected remuneration or reimbursement. The only compensation Earl could expect, and all he should desire, is the satisfaction of knowing that when his mother and sisters needed him most he did not fail them.

Earl had been of age only about two years at his mother's death, therefore the greater part of the serv-

ices he performed and funds supplied his mother were during his minority. Under the strict letter of the law Mrs. Gayheart was entitled to Earl's earnings while he was a minor, since his father had practically abandoned him. Kentucky Statutes, Section 326a-1; Kentucky Service Co. v. Miracle, 246 Ky. 797, 56 S. W. (2d) 521. In a family struggling to exist it would be strange if the mother would make a contract with a minor son to compensate him for his contribution to the commonweal while he was living in her home as a member of her family. Experience has taught us things do not happen that way. The evidence is neither clear nor convincing that an express contract existed between mother and son. What Mrs. Gayheart said was but a grateful mother expressing her gratitude to a dependable child and saying in an indefinite way that she hoped to reimburse him. Under the rules and authorities above referred to, such words in the circumstances shown by this record do not constitute an express contract.

The judgment is affirmed.