Charles E. MONTGOMERY, Executor of the Will of A. C. Smith, Appellant,

v.

Robert D. SMITH, Appellee.

Court of Appeals of Kentucky.

March 23, 1956.

H. M. Grigsby, Springfield, for appellant.

Charles M. McChord, R. L. Wathen, Springfield, for appellee.

STEWART, Judge.

Appellee, Robert D. Smith, sued the estate of his deceased father, A. C. Smith, for services performed over a period of five years next before the latter's death. His complaint alleged his father promised to pay him and he expected compensation for his services but he did not state what sum, if any, was agreed upon for his labor. He

averred the value of his work amounted to $6,000 and the jury awarded him $5,000.

This appeal is from the judgment entered upon the verdict, and the sole ground urged for reversal is that appellant, the executor under the will of A. C. Smith, was entitled to a directed verdict because there was not sufficient evidence to submit the case to the jury.

Appellee's chief witness was his mother, Liza M. Smith. According to her, appellee was induced by his father in 1948 to purchase a 100-acre farm adjoining the latter's home place which also contained approximately the same acreage. She testified her husband said: "'I want him (appellee) close by us, so when I holler he will be here, for he is our only dependent. We go to him for everything.'" Appellee did not have the money to pay anything down on the farm, consequently his father advanced him $6,000 to enable him to close the deal, and this transaction was evidenced by a note in favor of the father. This witness declared appellee was not required to pay any interest on the note he executed or any taxes on the farm he acquired. When asked whether her husband intended appellee should ever be called upon to liquidate the note, she made this statement: "He (her husband) said he was going to turn it over to him (appellee) for what he had done for us." Later in her testimony she stated she heard him make this statement with reference to this obligation: "'I am going to dispose of that note, and give the money to Robert, to pay him for what he has done for us.'" The record does not disclose what disposition the father eventually made of the note, but we may safely assume it came into the possession of appellant who has demanded that it be paid.

The evidence is all one way that appellee lived on his farm and worked on his father's land on a crop-sharing basis. The details of the agreement between him and his father were not made apparent, except it was definitely shown he received one-half of all the tobacco, corn and wheat raised on his father's place. There is a dispute as to whether the hay on the latter's farm was grown on the shares. Appellee's claim seemed to be based upon work he contends he performed on his father's land in addition to raising crops. He asserts this consisted of mowing, cutting bushes, cleaning up the farm, erecting and repairing fences, and helping to build certain structures. Appellee hired two laborers, one of whom worked six months out of the year and the other the year around. Both were paid by appellee and both divided their time about equally between the two farms. One of appellee's hired hands placed the value of the services appellee rendered his father at $1,000 per year, but he did not specify as to what items of labor this figure applied. This was the only witness who ventured an opinion in this respect; appellee's other witnesses, when questioned along this line, declined to make an estimate.

The decedent was survived by appellee, eight other children and his wife. Many of these have spent their lives in the vicinity of decedent's farm. Two daughters and three sons-in-law testified in behalf of the estate and they stated appellee and the decedent conducted their farms jointly, each helping the other back and forth when needed, and what was done on the two farms was undertaken for the mutual benefit of both parties. All declared appellee received one-half of the crops produced on his father's land. They said the older Smith was in good health until just prior to his death and he worked daily with appellee in the fields. It was brought out that, although some of them were in the company of their father almost every night up until the date of his death, visiting and playing cards with him, they never heard the decedent once mention he was under any obligation to pay appellee any compensation beyond such as was covered by the cropping agreement.

Appellee's claim is bottomed upon an express contract and the question to be determined is whether the recited proof is sufficient to sustain the demand sued on. It is the firmly settled rule in this jurisdiction that in the absence of direct and specific expressions embodying a categorical

promise to pay for services rendered the substituted circumstances necessary to establish the express agreement must be clear and convincing. See Gayheart's Adm'r v. Gayheart, 287 Ky. 720, 155 S.W.2d 1; Thompson v. Close, 280 Ky. 720, 134 S.W. 2d 635; Springer v. Springer's Executrix, 262 Ky. 121, 89 S.W.2d 624; Kellum v. Browning's Adm'r, 231 Ky. 308, 21 S.W.2d 459. If the proof shows that the one rendering the services expected to receive pay therefor and that the one accepting them had knowledge of such expectation and intended to pay therefor, then an express contract may be found. See De Fever's Ex'r v. Brooks, 203 Ky. 606, 262 S.W. 976.

The evidence is conclusive that appellee had a share-cropping agreement with his father. It was not denied that both men operated the two farms as a unit until shortly before the older Smith died and that the latter worked alongside appellee continually. Three items of labor for which appellee claims extra compensation were made up of mowing, cutting bushes and cleaning up the farm. We are furnished no particulars as to the purpose or extent of this work and we could easily believe such acts were preparatory to putting out a crop. To say the least, we are unable to conceive that this kind of labor could have been of a protracted nature. We are also left in the dark as to the length of time consumed in erecting and repairing fences. As to the buildings appellee helped his father with, these were a garage and two porches on the latter's home, and it was variously stated it took from two to eight weeks to accomplish all this work. It was shown the father aided the son when he needed assistance. He helped cut and strip appellee's tobacco, he did other farm work for him and on one occasion he assisted appellee in the construction of a brooder house on the son's farm. We could readily assume from this evidence that any so-called extra services rendered, no matter which one received the benefit, were performed on a work swapping basis.

■ When we consider the evidence with reference to the relationship of the parties, the share-cropping agreement existing between them, and the working arrangements carried out by them, we conclude appellee either did nothing on his father's farm not contemplated in his agreement or, else, whatever extraordinary services were rendered, if any, he performed the same in an emergency and for such a brief period of time that they must be regarded gratuitous.

■ The only hint that any payments were to be made to appellee comes from the testimony of his mother. She testified her husband, on one occasion, stated he intended to turn appellee's note over to him and, at another time, he said he was going to dispose of this note "and give the money to Robert, to pay him for what he has done for us." Does this evidence, standing alone, give rise to an express contract in favor of appellee? We do not believe it does. We have written many times that a casual or indefinite manifestation upon the part of one receiving favors to pay therefor is not enough of itself to create an agreement. The effect of statements of this character is fully discussed in Thompson v. Close, supra, and the case of Gayheart's Adm'r v. Gayheart, supra, had this to say in respect to such statements [287 Ky. 720, 155 S.W.2d 3]: "Acknowledgment of the services and the expression of gratitude by the recipient, accompanied by only a desire that the one rendering them should be compensated, or an indefinite intention to compensate him in the future, is not sufficient to establish an express contract."

In Murphy's Ex'r v. Bryan, 230 Ky. 224, 18 S.W.2d 978, 980, where the claim made for services performed by a sister of the decedent while occupying the same household was rejected, this Court said, and the statement is pertinent here: "* * * no reason is assigned why payment should be postponed until the indefinite period of the payor's death which might occur long after that of the payee." Nothing appears in the record in this case to show that the decedent was unable financially to make current payments for the services appellee alleged he contributed during the five years

in controversy. Unquestionably appellee in this instance placed himself in a bad light when he waited until his father's death before he asserted a five-year claim for work.

We conclude there was no proof of an express contract entered into between appellee and his father to warrant any compensation for his alleged services. It follows appellant was entitled to a directed verdict.

Wherefore, the judgment is reversed with directions that it be set aside and, if the evidence be substantially the same at another trial, a peremptory instruction will be given in favor of appellant.