Ellis BURKS, Respondent,

v.

Earl Jack LEAP and Dysart Dental Laboratory, a Corporation, Appellants.

No. 52015.

Supreme Court of Missouri,
Division No. 1.

March 13, 1967.

Motion for Rehearing or to Transfer to Court En Banc Denied April 10, 1967.

E. E. Thompson, Thomas A. Sweeny, Kansas City, for defendants-appellants, Popham, Thompson, Popham, Trusty & Conway, Kansas City, of counsel.

Robert L. Shirkey, Kansas City, for plaintiff-respondent.

HIGGINS, Commissioner.

Action for $25,000 damages for personal injuries. Verdict and judgment were for defendants, and defendants appeal from the award of a new trial to plaintiff on grounds. that the verdict was against the weight of the evidence and error in giving an instruction.

Plaintiff alleged that on January 14, 1964, at approximately 5:42 p. m., he was driving a 1962 Chevrolet in a southerly direction on Raytown Road near the intersection of 128th Street (129th Street at trial) in Kansas City, Missouri, and that defendant Leap, "as the agent, servant and employee" of defendant Dysart, then and there negligently operated a 1962 Corvair in a northerly direction into collision with plaintiff causing him to sustain bodily injuries. Defendants' separate answers were general denials and allegations of contributory negligence.

Richard L. Kinney of the Kansas City Police Department Accident Investigation

Unit received a call referable to this collision at 5:40 p. m., January 14, 1964. He proceeded to the scene and found the streets icy and "very slick out on the hill there." There were places with and without ice. When he arrived "approximately fifteen minutes" after the accident, it was almost dark; "it was dusk when the accident occurred." Raytown Road has blacktop asphalt surface 22 or 24 feet wide. He determined that Earl Jack Leap had been driving his 1962 Corvair north on Raytown Road and learned from him that he first noticed danger when approximately 100 feet from the collision site; that his speed at that time was approximately 40 miles per hour; and that his speed was approximately 25 miles per hour at collision. Mr. Kinney also determined that plaintiff was driving a 1962 Chevrolet 4–door station wagon south on Raytown Road, and learned from him that he also first noticed danger at approximately 100 feet from the collision; that his speed then was 20 to 25 miles per hour; and that his speed was 0 to 2 miles per hour at collision. Each driver was accompanied by his wife. The officer also determined that a car operated by Hollis Smith was "stuck" in the northbound lane headed south and that the Leap car struck it after colliding with plaintiff. He found damage to the left side of plaintiff's automobile and to the left front of the Leap automobile as a result of the collision between plaintiff and Mr. Leap, and damage to the right rear of Mr. Leap's automobile as a result of the collision between Mr. Leap and Mr. Smith. The officer found debris, dirt, and "drop-down" in plaintiff's side of the road, i. e., in the southbound lane or west half of the highway. He also found similar debris in the northbound lane near the Smith car, and stated that the two impacts were in the intersection approximately 25 feet apart. The officer judged the distance from the intersection south to the crest of the hill at approximately 750 feet. The shoulder on the east side of Raytown Road is fairly narrow and a ravine is beyond. There is a small shoulder and a drainage ditch on the west side. The officer judged an ordinary automobile to be approximately 6 feet wide. He reported the speed limit as 50 miles per hour and it was posted at 55 miles per hour at trial.

Plaintiff was 34 years of age, employed by Armco Steel at the time of the collision. He was driving his 1962 Chevrolet station wagon from his home in Independence to take his wife to a doctor in Grandview. The weather was clear and cold and there were "spots of ice" on the road. He was not using chains or snow tires and had experienced no difficulty in controlling his automobile. He was familiar with Raytown Road and, on this occasion, had been on it for "maybe a half hour or better." His speed was approximately 25 or 30 miles per hour before slowing down approximately 25 or 30 feet north of the "stuck" vehicle (Smith's). He saw the Smith vehicle headed south with its left side nearly in the ditch on the east side of the road and "approximately one foot of his right wheels was on the edge of the pavement." He could see the Smith vehicle for a quarter mile. It was daylight and he had no trouble seeing the vehicle or the people around it. He operated his automobile with its left side approximately 3 feet west of the center line. He judged Raytown Road to be 24 feet wide.

Plaintiff first saw the Leap automobile when "I was approximately 25 feet south of the stalled vehicle, * * * ten to fifteen feet" north of the intersection. The Leap car was at the crest of the hill "in the center of the road. * * * He changed his course * * * to the right * * * to his side of the road." Plaintiff judged Mr. Leap's speed at 55 to 60 miles per hour at the time of the described movements. Plaintiff was then going about 20 to 25 miles per hour ("I sped up after I went past the stalled vehicle") and, upon seeing defendant, "I let up on the gas and started to pull over." He traveled approximately 75 feet all on his side of the

road after first seeing Mr. Leap. As the Leap car came down the hill, plaintiff "slowed up and pulled over. I pulled over to the right or the west shoulder. My right wheels were approximately a foot off the shoulder." Approximately seven feet of his lane were open. "I was stopped or nearly stopped" at the time of collision, "zero to two miles an hour." He didn't pull off further because he "didn't want to run into the ditch." According to plaintiff, there was no reason why the Leap car could not have passed to plaintiff's left and gone on down the highway. As the Leap car came down the hill "it was on my side of the road two or three times, back and forth," and it finally came over to plaintiff's side of the road and into collision going about 40 miles per hour, striking its left front against the Chevrolet "at the driver's door and clear on to the back." It was then about 5:30 p. m. Plaintiff judged this collision to be approximately 100 feet south of Mr. Leap's second collision with the Smith automobile. He talked at the scene with Mr. Leap, who said, "I suppose I was going too fast." Plaintiff had no difficulty moving his automobile up the hill after the collision.

Upon cross-examination plaintiff was confronted with deposition testimony of speed at 35 to 40 miles per hour, but confirmed his maximum speed at 25 to 30 miles per hour and, in respect to movements of the Leap automobile and points of collision, testified:

"Q. You say that he slid all that way at 50 or 60 miles an hour and it wasn't slippery? A. I don't know whether he slid or not, Sir; I know he was going back and forth.

"Q. He was sliding as if he was on ice? A. I can't say that; I know he was going back and forth.

"Q. It appeared to you that he was out of control that entire distance? A. Yes, sir.

"Q. Are you telling the jury that you traveled on up the road 100 feet beyond the intersection when the collision occurred? A. No, sir.

"Q. How far? A. Approximately 75 feet.

"Q. Isn't it true that in actual fact the two collisions, the collision with your car and the collision with the Smith car, were only 25 feet apart? A. No, sir, not to my knowledge. * * *

"Q. If you moved 75 feet from the time you first saw Mr. Leap's car you will agree that you have told the jury he was sliding apparently out of control as far as you could tell? A. Yes, sir; I said he was out of control. He appeared to be."

Plaintiff was in the act of stopping, or stopped, at the time of collision, but did not apply his brakes hard until about 30 feet from the point of collision. As to speed and distance, the cross-examination continued:

"Q. I want you to tell the jury how many feet you had traveled at an average speed of 20 or 25 miles an hour while he traveled 600 feet at 50 miles an hour. A. How many feet did I?

"Q. How far had you traveled? It is a matter of mathematics. A. I know how many feet I did travel.

"Q. Isn't it true that under your sworn testimony you were at least 200 feet from the point of impact when the man came over the hill, as a matter of mathematics? A. Yes, sir, at least—more than that."

Upon redirect examination plaintiff further described Mr. Leap's movements as having crossed the center line as far as three or four feet three or four times, but never blocking plaintiff's lane of traffic. He testified further:

"Q. Until he approached closer to you did you have any reason to apprehend the fact that he would later crash into you? A. No, sir.

"Q. You said you realized danger of a collision 100 feet until the crash occurred? A. Yes, sir.

"Q. How far did he travel? A. He possibly had 300 or 400 feet.

"Q. When he finally came across the center line at the last time did he come on across fully into your lane? A. He was headed directly over into my lane.

"Q. Did he swerve back and forth then? A. No, sir.

"Q. Why had you not stopped before then? A. It appeared to me that he would go on by. * * *

"Q. Did you know that he was slipping and sliding? A. I knew that he was going back and forth but I didn't know why.

"Q. But the last time you did pull to your right? A. Yes, right before the impact.

"Q. Your right wheel was on the shoulder? A. Yes, sir."

Plaintiff's wife, Charlene Burks, described conditions existing at the time of the accident as "cold and there was spots of ice on the road." According to her, the accident occurred "around 5:30, * * * between five and five-thirty." She judged her husband's speed at 25 miles per hour prior to any change of speed near the collision; "he began to slow down as he approached the (Smith) car." Her husband slowed to about 15 miles per hour and "when we came even with it he speeded up just a little." She first saw the Leap car after her husband was south of the intersection and "he immediately began to slow down and pull off to the side of the road." In respect to the movements of the Leap car, she testified:

"Q. When you first looked up and saw him where was he in regard to the center line of Raytown Road? A. The driver's side was across the line, on our side of the road.

"Q. Was he at that time partially over the center line, you say? A. Yes, he was.

"Q. What happened to his car after that? A. He pulled back onto his side of the road and then back on our side again, and then back on his side again.

"Q. Did he continue coming down the hill? A. Yes.

"Q. Did you form any judgment of how fast he was going from the time that you saw him until the collision occurred? A. It would be my judgment he was going between forty and fifty miles an hour.

"Q. Did he ever come sideways down the highway? A. No, not sideways. * *

"Q. Did he ever fully get over into your lane of travel prior to the impact? A. No, I wouldn't say he was fully into our lane. * * *

"Q. At the time of collision where was the car that you were riding in? A. We were partially on the shoulder on our side of the road with our right wheels off of the road. * * *

"Q. Could you tell us the rate of speed of your husband's automobile at the time of the collision itself? A. Well, we were just almost completely stopped I would say. If we were moving it was very slowly, maybe two miles an hour or so. It would be my judgment we were almost stopped at that time."

Earl Jack Leap described the situation: "As I crested the hill I had observed two automobiles a little over half way down the hill. They appeared to me being fairly close side by side * * * just north of the intersection." His speed was 35 or 40 miles per hour, it was dusk, and his headlights were burning. He thought Smith and Burks had headlights burning also. He saw the Smith automobile as having its left wheels "barely onto the shoulder and the rest of his automobile was onto the highway." Mr. Burks was

taking his complete lane, the southbound lane, which would have been the west side of the highway. Mr. Leap shifted into second gear and, as he got closer, applied his brakes. He began to slide; "there was almost a solid sheet of ice all the way up and down Raytown Road at that hill." He saw the Smith car beginning to turn onto 129th Street; "there was a space that was beginning to open and I was in hopes of making it in between the two automobiles." He was unable to, and did not get stopped. His car did some weaving "when I done shifted my automobile," and he saw Mr. Burks "fishtailing." At the time of collision around 20 feet separated the front of the Burks automobile and the front of the Smith automobile; he tried to cut in between them. He placed the point of collision with the Burks automobile "midway of the intersection, possibly just a little south." He conceded that Mr. Burks was on his own side of the road. He denied making any statement of speed to Mr. Burks and denied any evasive action by Mr. Burks.

Judith Kay Leap, wife of Earl Jack Leap, corroborated her husband in his statement of speed at 30 to 35 miles per hour, his shift into second gear, his car sliding, and the icy road condition. Also, according to her, Mr. Leap was generally on his own side of the road until he got close to the Burks automobile and, at the time of collision, Mr. Burks had the front end of his automobile off the highway.

Exhibits in evidence showed the snowfall in the area, the snow on the ground, and temperature conditions from January 12,´ 1964, to January 15, 1964. Sunset on January 14, 1964, was at 5:19 p. m.

Plaintiff was thrown forward by the impact, bumping his head and twisting his neck and shoulder. He felt a stabbing pain in his neck at the scene and developed pain and limitation of use in his right shoulder, resulting in a reduction of his normal activities.

Appellants charge the court with error in granting a new trial on the ground the verdict was against the weight of the evidence because: "(1) Plaintiff was guilty of contributory negligence as a matter of law * * *; and (2) There was insufficient substantial evidence to sustain a verdict for plaintiff."

■■■ Determination of these issues requires a consideration of the evidence in a light most favorable to plaintiff, including the benefit of all favorable inferences reasonably to be drawn from the evidence and a disregard of defendants' evidence unless it aids plaintiff. Kiburz v. Loc-Wood Boat & Motors, Inc., Mo., 356 S.W.2d 882, 885 [4]; Adkins v. Boss, Mo., 290 S.W.2d 139, 140 [1]. In according this consideration, it also must be recognized that a plaintiff is bound by his own testimony. Brooks v. Stewart, Mo., 335 S.W.2d 104, 110 [4], 81 A.L.R.2d 508; Adkins v. Boss, supra, 290 S.W.2d 1. c. 140 [2].

■■■ The instructions directed a verdict for plaintiff if defendant Leap was negligent in that he either "* * * drove at an excessive rate of speed, or drove on the wrong side of the road * * *." Appellants do not brief their charge of failure to make a case on these submissions beyond mere statement of the point. Therefore, suffice it to say that the stated evidence is sufficient from which a jury could reasonably find: that the collision occurred on plaintiff's side of the road; that defendant Leap drove his automobile on the wrong side of the road and into collision with plaintiff; that his speed was excessive in that he was unable to stop prior to collision with plaintiff; and that such acts were the proximate cause of the collision and plaintiff's injuries and damages.

Appellants argue that plaintiff was guilty of contributory negligence as a matter of law because, under all the circumstances in evidence, he did not stop or swerve even though, by his own testimony, he saw defendant Leap crest the hill at 55 to 60

miles per hour and watched him descend for 200 feet, crossing the center line three or four times.

Appellants' argument recognizes that plaintiff did stop and did swerve; their complaint appears to be that he should have done so sooner or to a greater degree. However, a motorist in plaintiff's situation is not obliged to stop or swerve merely because another vehicle is approaching. There must be a reasonable likelihood of collision before he is required to act, and time thereafter to take effective preventive action in avoidance. Miller v. Greis, Mo., 396 S.W. 2d 642, 646 [3]. See also Nelms v. Bright, Mo., 299 S.W.2d 483, 489 [14–16]; 60 C.J.S. Motor Vehicles § 317 b. Without question, this plaintiff was at all times on his own side of the road, and his evidence was that only when defendant Leap finally drove completely and directly over into his lane did he have any cause to apprehend danger from Leap. Until that time defendant Leap had never traveled directly and wholly in plaintiff's path, and plaintiff thought he would go on by. When it did appear in the last few feet before collision that Leap had driven entirely into his lane to stay, plaintiff took evasive, although unavailing action by stopping and swerving, using his judgment not to pull so far to the right as to drive into the ditch and endanger his wife. Such are not the circumstances which, as a matter of law, dictate the only reasonable conclusion to be that plaintiff was negligent and that his negligence was the proximate cause of his injury.

The facts of no two cases are exactly alike, but the following cases support the conclusion drawn here. See and examine Baker v. Kirby, Mo., 396 S.W.2d 605, where plaintiff drove her automobile on a narrow gravel road, saw defendant's automobile at all times coming on the road toward her, thought that he was properly on his side of the road, was not alarmed, and was aware of imminence of collision only when she heard gravel and saw defendant's automobile sliding toward her. Plaintiff was not contributorily negligent as a matter of law, Chandler v. Mueller, Mo., 377 S.W.2d 288, where Chandler, proceeding southward, observed Mueller traveling northward and at 45 miles per hour, "swerving, going this way and that way." Chandler stopped beside a parked car at the west curb and Mueller drove across the road and struck him. Chandler saw Mueller at all times and, in answer to why he did not pull out of the way, said, "I thought he would pull over. I didn't think he would run into me." Chandler was not contributorily negligent for failure to keep a lookout and act accordingly. See also Zalle v. Underwood, Mo., 372 S.W.2d 98.

Cases cited by appellants are not controlling. In Brooks v. Stewart, supra, 335 S.W.2d 104, 81 A.L.R.2d 508, plaintiff was traveling on his side of the road and came upon and collided with a road grader which he saw at all times to be coming toward him while working on the wrong side of the road. The distinction from Mr. Burks's situation is in the holding that "there is no evidence tending to show that plaintiff thought or believed the grader would return to its right * * * side of the highway after he first saw it * * * and there is no evidence to support an inference that the grader might turn back to its righthand side of the highway." 335 S.W.2d l. c. 111, 81 A.L.R.2d 508. " * * * from the first moment he saw the grader he knew all of the surrounding facts and circumstances as to snow, ice, grade and visibility and knew that he could not tell which side of the road the grader was on. He knew it was approaching and he *thought* it was on his own side of the highway. In such circumstances he could not proceed heedlessly into known danger until it was too late to stop or turn aside." 335 S.W.2d 112 [7, 8]. In Adkins v. Boss, supra, 290 S.W.2d 139, the plaintiff truck driver was contributorily negligent as a matter of law in that he failed to make timely effort to slow his heavy rig to cope with potential danger at a marked intersection and, later, to avoid collision with a vehicle entering

the intersection. Again, the distinction lies in the court's language: "He carelessly, almost deliberately, drove into danger. His own testimony demonstrates that in the stated circumstances plaintiff was taking a chance that the approach of his heavy equipment would dominate and command a priority of passage through the intersection." 290 S.W.2d 1. c. 144 [6]. Yeaman v. Storms, 358 Mo. 774, 217 S.W.2d 495, involved a motorist who tried to "beat" another motorist by driving across an intersection when he saw the near approach of traffic "and merely for the purpose of trying to first cross the intersection, or with indifference to a collision." 217 S.W.2d 1. c. 500 [6].

Appellant Dysart contends that it should have had a directed verdict because: "(1) Defendant Leap was not acting as the agent of corporate defendant at the time of the occurrence * * * when he was enroute to his home after having made a delivery, which he volunteered to make in Belton, Missouri; (2) If it be assumed arguendo Leap was corporate defendant's agent to make the delivery in Belton, after making the delivery Leap had no further work to do for corporate defendant until the next morning at 8:00 A.M.; (3) Corporate defendant had no right of control whatever over Leap at the time and place of the occurrence."

Earl Jack Leap, called by plaintiff, testified that on January 14, 1964, he lived at 9149 East 79th Street, Raytown, Missouri. He was employed as a gold technician by Dysart Dental Laboratories, a corporation, with offices in the Argyle Building at 12th and McGee in downtown Kansas City, Missouri. His route home from work at five o'clock each day was southeasterly on Highway 50.

"Q. And on the day in question, January 14, 1964, you had been asked by one of the employees of your company there to make a delivery to Belton, Missouri, had you not? A. Yes, sir.

"Q. That was by whom? A. That was by our secretary, if I remember correctly.

"Q. She customarily details and instructs on the delivery of these various products, does she not? A. Yes, sir.

"Q. You have in the past made on occasion deliveries for your company? A. Prior to that? Q. Yes, on occasion. A. I don't remember whether I had or not.

"Q. You have on occasion since made deliveries for them? A. Yes.

"Q. That was with full knowledge and consent of Mr. Guy Dysart, was it not? A. Yes, sir.

"Q. On this day in question you left the office at about 4:30, did you not? A. Probably.

"Q. That was to make a delivery to Dr. Perme in Belton, Missouri? A. Yes.

"Q. Belton, Missouri, lies directly south of Kansas City, does it not? A. Yes.

"Q. And the road you would take to go to Belton was Highway 71? A. Yes, sir.

"Q. Except for that delivery you wouldn't have been on Highway 71 at that time? A. That is correct.

"Q. Do you know what time it was that you made the delivery to Dr. Perme? A. Probably about ten after five, or a quarter after five.

"Q. And then after making your delivery you were on your way back home? A. Yes, sir.

"Q. This collision took place at what was then called 128th Street and Raytown Road? A. Yes, sir.

"Q. Except for you making that delivery you wouldn't have been at that place, would you? A. That is right.

"Q. Because this is not the route you would take to go home? A. That's right.

"Q. How far is it in your best judgment from there where the collision took place at 128th and Raytown Road to your home? A. I would imagine five miles.

"Q. And it would have been at least that far to Highway 50, the route you would ordinarily have taken? A. Yes.

"Q. And on the day in question if you hadn't been making this delivery you would have been going up Highway 50? A. Yes, sir. * * *

"Q. You had no other occasion to be there at that point and place at all except making this delivery on behalf of the company? A. That is right."

Mr. Leap was using a car owned by his father-in-law and he received no additional compensation for the Belton trip. "It was just my time until five o'clock." He was not normally a delivery boy and on the occasion of this delivery had no further work until eight o'clock the following morning.

Guy Otis Dysart testified by deposition: "We have a dental laboratory. I'm the owner of a dental laboratory." The laboratory is incorporated; Mr. Dysart is president; his son-in-law is vice-president; his wife is secretary-treasurer.

In respect to Earl Jack Leap and events of January 14, 1964, he testified:

"Q. * * * Did he ever do any delivery work of any kind, of your finished product? A. Well, I guess so, on that particular occasion that he was taking the case home. * * *

"Q. * * * Now, back on January 14, 1964, * * * did you ask Mr. Leap to make a delivery on your behalf? A. No, sir.

"Q. What did you do? A. I did not, I don't—I knew nothing about it whatever. My secretary handled that. * * *

"Q. Have you ever made inquiry as to what he may have been delivering on your behalf? A. Well, yes, I knew later, when I heard of this suit, that he was delivering a case for Dr. Perme that wasn't ready on the morning delivery. We have—that's what we call a morning delivery, it goes out—usually starts at ten o'clock, and then he—it reaches Dr. Perme's office where this case was delivered possibly around twelve.

"Q. Yes. A. And it just wasn't ready for the morning delivery, so he lived out that way, and that's the reason he took the case. * * *

"Q. * * * Did he tell you who told or asked him to make the delivery? * * * A. Well, I've already told you how he come to do it.

"Q. The secretary— A. He lives out that way and the case wasn't ready in the morning delivery so he volunteered to take it, I believe."

Finally, Mr. Leap testified upon direct examination in defendants' case: "Q. I believe we have already established that you left down town Kansas City, Missouri and went out to Belton, Missouri, to deliver a case to Dr. Perme? A. Yes, sir."

▮ A master is responsible for injury to a third person by any negligence or misconduct of which his servant is guilty while acting within the scope of his employment, 20A Mo.Dig., Master & Servant, ☞300; and whether a servant's act causing injury to a third person is within the scope of his employment is not determined by the time nor his motive, but "the question is, Was the act done by virtue of the employment and in furtherance of the master's business?" Wolf v. Terminal R. Ass'n of St. Louis, 282 Mo. 559, 222 S.W. 114. See also MAI 13.05.

▮ The evidence on this issue is, as stated by appellant, "all offered by plaintiff (and) uncontradicted." Under such evidence there is no question but that Leap was an employee of Dysart, and it would be proper for the jury to determine whether the mission in question was a part of that employment and for the benefit of the em-

ployer. A jury reasonably could find that Dysart did make deliveries of its "cases" as a regular part of its business and that, even though Leap was employed generally as a gold technician, he was called upon on this, as well as on other occasions, to perform delivery services which were for the sole benefit of the employer; that on the date of the collision he was asked by the employee who customarily directs deliveries during regular working hours to make such a delivery at Belton; that he proceeded without deviation to carry out that mission and was proceeding without deviation to return to his regular route to his home; and that the collision and damage to plaintiff occurred under circumstances of time and place which would not have existed except for the mission of the employee requested of, and undertaken by, the employee for the benefit of his employer.

Smith v. Fine, 351 Mo. 1179, 175 S.W.2d 761, is in point. Fine worked for an insurance company and made collections as part of his duties. He ordinarily would go to work at 9:00 a. m., would be given a list of persons from whom to collect, would proceed in his own automobile, note payments received, and account for them the following morning. This was the work for which he was paid a salary. On the morning of his accident defendant was not proceeding in the direction of his employer's office but was proceeding in a nearly opposite direction to make a collection before reporting for the day's work. The accident interrupted his plans. The court determined that it was for the jury to determine whether the relation of master and servant existed, drawing the distinction which separates cases in which going to and from the place of work is for the employee's purposes from those in which the trip is for the master's benefit as in this case. "Whether Fine was at the time acting within the scope of his employment was also for the jury. Usually, a servant using an automobile, either his master's or his own, in going to and from his place of work, is regarded as acting for his own purposes

and not as engaged in work for his master. Pesot v. Yanda, 344 Mo. 338, 126 S.W.2d 240, 244. The instant situation is the reverse of those existing in cases where an employee deviates from his duties and enters upon a personal mission. Here, if the doctrine of respondeat superior be considered not applicable while Fine was going to and from work, Fine at the time in question had deviated from his personal mission of going to his employer's office and had entered upon the performance of a duty owed his employer. * * * Any accommodation accruing to Fine for making the trip prior to reporting to work was incidental to the discharge of his duties as one of the * * * Company's collectors. Otherwise, no occasion existed for his making the trip. At least the jury could find that it was made on behalf of Fine's employer." 175 S.W.2d l. c. 766 [8, 9]. See also Gardner v. Simmons, Mo., 370 S.W.2d 359, in which it was for the jury to say whether a salesman, employed by defendant tire company, was engaged in scope of employment at the time of an accident which occurred as the employee and a mechanic were checking the employee's automobile which had broken down on the way to work to determine if it was all right for the salesman to use on his job of calling on his employer's customers the rest of the day. The test applied was "whether, at the time of the accident, Simmons was engaged primarily in advancing the interests of his employer and thus within the scope of his employment." 370 S.W.2d l. c. 365 [8].

Stokes v. Four-States Broadcasters, Inc., Mo., 300 S.W.2d 426, relied upon by appellant Dysart, is not like this case. There, the employee would frequently "pick up" a broadcast schedule at the radio station on his way to work and deliver it to the transmitter station where he worked; other employees did the same thing. It was held that the employee's act "in 'picking up' the schedule with more or less regularity was a casual, gratuitous act which he performed when necessary and convenient, at

a time of his own choosing. There is no indication that he ever delivered the schedule to the station except when he was going there to report to work, a trip he would have made irrespective of any delivery of the schedule." 300 S.W.2d l. c. 430 [5].

 And, since the jury reasonably could find a master and servant relationship between Leap and Dysart during the course of the delivery performed by Leap at the direction of and for the benefit of Dysart, right of control would attend the relation, Douglas v. National Life & Acc. Ins. Co., 236 Mo.App. 467, 155 S.W.2d 267, 270 [2], and cases cited by appellant Dysart in which right of control was absent as a matter of law are not in point. See Douglas v. National Life & Acc. Ins. Co., supra, 155 S.W.2d l. c. 271 [6]; Klotsch v. P. F. Collier & Son Corp., 349 Mo. 40, 159 S.W.2d 589, 594 [4, 5]; Estes v. Owen, 350 Mo. 753, 168 S.W.2d 1052, 1053; Usrey v. Dr. Pepper Bottling Co., Mo., 385 S.W.2d 335, 339 [7–9]; Sherwood v. Arndt, Mo., 332 S.W.2d 891, 893 [1]; Restatement of the Law, Agency 2d, § 233c, Illustration 3, p. 518. Nor are those cases cited by appellant Dysart in point where the employee has finished his day's work and is driving home as compared to the situation of Mr. Leap who, as has been shown, reasonably could have been found to have not yet completed the day's work delegated to him by his employer, Dysart. See Halsey v. Metz, Mo. App., 93 S.W.2d 41, 44 [1–4]; Van Hook v. Strassberger, Mo.App., 259 S.W.2d 399, 405 [6–10]; Beckwith v. Standard Oil Co., Mo., 281 S.W.2d 852, 855 [3]; 52 A.L.R.2d § 9, p. 311.

Appellant Dysart also emphasizes the lack of any compensation in addition to regular salary for the delivery trip made by Leap for his employer, Dysart, but "compensation to the agent is not essential to the creation or existence of the relationship * * *." Leidy v. Taliaferro, Mo., 260 S.W.2d 504, 507 [5].

Appellants suggest that if the issues of submissible case be ruled against them, the court should rule whether the giving of Instruction No. 4 (on contributory negligence) was supported by substantial evidence, "to the end a guideline will be provided for the Court upon retrial." It is neither necessary nor advisable to accept this request because the retrial may differ from this record, and the parties will have the benefit of the briefs to this court on the point and may be guided by them if so advised. Edwards v. Mellen, Mo., 366 S.W.2d 317, 321.

Judgment affirmed and cause remanded.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All concur.